1999 UT 59

STATE of Utah, Plaintiff
and Respondent,

v.

Kirk Scott SAUNDERS, Defendant
and Petitioner.

No. 950295.

Supreme Court of Utah.

June 11, 1999.

Rehearing Denied Nov. 23, 1999.

Jan Graham, Att'y Gen., Thomas Brunker, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Curtis C. Nesset, Athens, Ga, for defendant.

On Certiorari to the Utah Court of Appeals

STEWART, Justice:

¶ 1    Kirk Scott Saunders was convicted of one count of sexual abuse of a child pursuant to Utah Code Ann. § 76–5–401.1 (1990). The Court of Appeals affirmed, *State v. Saunders*, 893 P.2d 584, 592–93 (Utah Ct.App. 1995), and we issued a writ of certiorari to review that court's decision. 910 P.2d 425 (Utah 1995). We now reverse and remand.

## I.    FACTS

¶ 2    Defendant married Deborah Smith in January 1980. They had three children, a girl (B.C.) and two sons. The couple separated in September 1990, and according to the children's choices, Ms. Smith obtained temporary custody of B.C. and the youngest son, and defendant obtained temporary custody of the oldest son. At the time of trial, the youngest son was eight years old, B.C. was nine years old, and the oldest son was eleven years old. The parents had no over-night visitation privileges with their noncustodial children until February 1991. In early 1991, after the separation and while divorce proceedings were pending, B.C. began periodic overnight visits to her father's apartment. The relationship between defendant and his wife during the divorce proceedings was characterized by hostility, acrimony, and bitterness that resulted in numerous court appearances. The divorce decree was entered in April 1992.

¶ 3    In April 1991, Ms. Smith called detective Michael Mitchell of the West Valley Police Department. He talked with B.C. concerning an allegation that defendant had touched her inappropriately. When Detective Mitchell questioned defendant, he apparently explained that B.C. had a rash, or chaffing, in her crotch and buttocks area as a result of having wet her pants and that he had applied a medicated ointment, Desitin, to the affected areas. No charges were filed. Sometime thereafter, both B.C.'s and her brother's overnight visits with their father were suspended, and B.C. began therapy. In October 1991, B.C. turned eight. The visits resumed in late 1991 or early 1992 and continued until June 1992, during which time B.C. slept in the apartment of defendant's friend, Rita Aagard Bybee, pursuant to an agreement with B.C.'s mother.

¶ 4    In early June 1992, B.C.'s parents had a quarrel relating to payment of child support. The following week, B.C.'s mother again called Detective Mitchell. Following Mitchell's investigation, the State in mid-June 1992 charged defendant with one count of attempted rape of a child and one count of sexual abuse of a child. The information did not allege that those acts occurred at any particular time or place but only that they occurred "on or about October 1991 through May 1992."

¶ 5    At trial, B.C., then aged nine, gave somewhat conflicting, confused testimony as to defendant's acts. She obviously had been coached, as evidenced by her use of adult anatomical vocabulary and conclusory legal

terminology, such as that she had been "sexually abused" by her father. She could not remember how many times he had "sexually abused her." When asked to guess, she guessed "at least 15" times, but what she may have meant was that she guessed that he had applied Desitin to her fifteen times, because she later stated that her father had applied a yellow salve on fifteen occasions. She then stated, on the State's direct examination, that those events had occurred in 1991, when she was in the second grade, i.e., prior to the period charged in the information. Still later, she testified that defendant had touched her "around" sixteen times without salve, but she then stated that he had touched her with salve in 1992.[1] In closing argument, the prosecutor asserted that defendant had touched B.C. illegally thirty-one times. On appeal, the State now asserts some fifteen touchings but does not state whether that was with or without Desitin. B.C. also testified that defendant had "rubbed" her "breasts" with his hand on two occasions. She did not link any of the genital touchings to any specific date or event, although she did state that defendant had touched her during her last visit to his apartment, apparently shortly before the 1992 abuse allegations were made. Except for one occurrence that B.C. said took place in the apartment of Rita Bybee, the occurrences took place in defendant's living room. B.C. also stated that each time defendant touched her, they both had their clothes on, but on occasion defendant touched her underneath her underwear. B.C.'s brothers were either outside playing or asleep on the living room floor during these occasions. The last incident took place in June 1992. B.C. acknowledged that she had on occasion wet her pants and that defendant had applied a salve to treat a rash.

¶ 6 Defendant testified that both B.C. and her younger brother had bladder incontinence problems and that on at least one occasion B.C. had both wet and soiled her pants. He stated that he had applied Desitin to B.C.'s vaginal and buttocks area to treat a diaper rash-like irritation caused by the wetting but had done so no more than five times. On cross-examination, he testified that each such instance took place prior to the period charged in the information and that he had not touched B.C.'s genital area after Detective Mitchell talked to him in April 1991, including any time during the period charged in the information.

¶ 7 Saunders made a pretrial motion in limine to bar evidence pertaining to preinformation touching of his daughter. The trial court denied the motion and instead entered an order affirmatively allowing the prosecution to adduce preinformation evidence of defendant's conduct with respect to B.C. The order also provided that defendant would have to object to preinformation evidence of a specific nature, and the court would then rule on the objection. All of defendant's objections to preinformation evidence at trial were overruled. On the State's motion at the close of evidence, the court dismissed the attempted rape charge for insufficient evidence. The jury found Saunders guilty of one count of sexual abuse.

¶ 8 On appeal to the Court of Appeals, Saunders argued that the conviction should be reversed because (1) the prosecutor was guilty of misconduct in eliciting testimony concerning Saunders' conduct prior to the period charged in the information and in arguing that the jury should convict because of that conduct; (2) jury instruction 26 violated the constitutional requirement that jurors be unanimous in returning a guilty verdict; (3) the trial court erred in refusing to remove for cause a juror who had been sexually abused; and (4) he was denied effective assistance of counsel. A number of other issues were also raised; the Court of Appeals summarily disposed of them. See Saunders, 893 P.2d at 587 & n. 1.

¶ 9 The Court of Appeals rejected Saunders' argument that the prosecutor's references to allegations of defendant's preinformation criminal conduct constituted prejudicial misconduct by the prosecutor.

1. A close reading of the transcript discloses considerable confusion as to the number of touchings, when they occurred, and whether they were with or without salve. In this light, it is highly revealing that the prosecution actually moved to amend the information at the close of all evidence to include illegal acts that occurred in 1991. That motion was denied.

That court stated: "The prosecutor's comments were undeniably at odds with the court's [pretrial in limine] order in that the prosecutor discussed details of the 1991 investigation. It also appears that these comments were used to imply defendant's guilt based on his prior acts, and, if viewed in isolation, they might well constitute prosecutorial misconduct." *Id.* at 590. Nevertheless, the Court of Appeals concluded that the comments did not constitute misconduct because "it was defendant, not the prosecutor, who initially introduced a detailed version of what proved to be the 1991 incidents" through his own testimony. *Id.* at 591. The Court of Appeals ruled that defendant had opened the door to the 1991 evidence and, therefore, the prosecution was free to explore the subject of the 1991 investigation.

¶ 10  The court also held that any error in instruction 26 on jury unanimity was not plain error because the question of whether the jury had to be unanimous as to a specific incident or incidents of sexual abuse was a question of first impression in Utah and that "Utah cases considering jury unanimity in other contexts provide no uniform rule that, by extension, would have made it obvious to the trial court that Instruction No. 26 would be erroneous." *Id.* at 589.

¶ 11  We granted defendant's petition for a writ of certiorari. *State v. Saunders*, 910 P.2d 425 (Utah 1995). Defendant argues that the Court of Appeals erred in holding that (1) the prosecutor was not guilty of misconduct in arguing that the jury should consider evidence that Saunders abused B.C. in 1991 in the context of the 1992 charges; (2) the trial court did not err in refusing to allow defense counsel to question prospective jurors on voir dire concerning any specialized knowledge they might have concerning sexual abuse of children; (3) jury instruction 26 did not constitute plain error; and (4) *State v. Menzies*, 889 P.2d 393 (Utah 1994), which held that defendants must prove actual prejudice when a trial court erroneously fails to grant a for-cause challenge to a prospective juror, applied retroactively.

## II. PLAIN ERROR IN THE ADMISSION OF EVIDENCE OF DEFENDANT'S ALLEGED PRIOR CRIMINAL CONDUCT AND IN THE PROSECUTOR'S CLOSING ARGUMENT TO THE JURY

¶ 12  We are acutely aware of the heinous nature of child sexual abuse and the deep scars and long-lasting effects that sexual abuse of a child has on the victims. We are also acutely aware of the evidentiary difficulties that sometimes confront both the prosecution and the defendant in litigating such cases. Sexual abuse of children is usually committed covertly, and sometimes evidence is hard to discover. On the other hand, defendants are sometimes confronted with emotionally charged allegations with nothing but the defendant's word to refute those allegations. In such circumstances, adherence to the rules designed to sift truth from error is critical.

¶ 13  Several observations concerning the factual nature and context of this case are in order. First, there was no medical evidence and no physical evidence of any kind, such as damage to or bruising of sensitive tissues, that indicated sexual abuse of the victim. Second, there was no evidence that B.C. exhibited behavioral symptoms consistent with her having suffered sexual abuse.[2] *See State v. Kallin*, 877 P.2d 138, 140–41 (Utah 1994). Third, no third person witnessed any abuse; the only witnesses who could testify directly on that point were B.C. and her father. Fourth, the allegation of sexual abuse occurred during a highly acrimonious divorce proceeding between defendant and B.C.'s mother, who had custody of B.C., and B.C. asserted that abuse occurred only during the time the divorce proceedings were in progress, not prior to them. A charge by one spouse accusing the other spouse of sexually abusing a child and the recruitment of the child in the cause occurs not infrequently in divorce cases to gain leverage in custody and child support issues. *See generally* John E.B. Myers, *Uncharged Misconduct Evidence in Child Abuse Litigation*, 1988 Utah

---

2.  Although bed wetting may be one such symptom, there was no evidence that B.C. wet the  bed, and her daytime urinary difficulties appear to have been wholly unrelated.

L.Rev. 479, 500–01 (citing Corwin et al., *Child Sexual Abuse and Custody Disputes*, 2 J. Interpersonal Violence 91 (1987)).

¶ 14 The critical factual issue for the jury in this case was the credibility of the father, who admitted applying Desitin to his daughter's vaginal and buttocks areas for lawful hygienic or medicinal purposes but who denied having touched her genital area on any other occasion or for any other purpose, and the credibility of the daughter, who also testified that sometimes her father had applied salve to her vaginal and buttocks areas but also that he had "touched" her without applying a salve. The jury, therefore, had to decide the issue of guilt or innocence solely on the basis of the demeanor and testimony of the father and the daughter. In this context, the governing evidentiary and procedural rules designed to enable a trier of fact to sort out truth from falsehood must be applied with punctiliousness to avoid factual error and injustice.

### A. Admissibility of Prior Crime Evidence Generally

¶ 15 It is fundamental in our law that a person may be convicted criminally only for his acts, not for his general character. That principle is violated if a conviction is based on an inference that conviction is justified because of the defendant's criminal character or propensity to commit bad acts. The admission of evidence of prior crimes may have such a powerful tendency to mislead the finder of fact as to subvert the constitutional principle that a defendant may be convicted only if guilty beyond a reasonable doubt of a specific crime charged. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). For this reason, the law has long prohibited the admission of prior crime evidence unless such evidence is probative of an issue other than criminal propensity or character and is not unduly prejudicial. The rule limiting the admissibility of evidence of prior crimes, as presently stated in rule 404(b) of the Utah Rules of Evidence, has existed for almost a century in this state. *See, e.g., State v. Doporto*, 935 P.2d 484, 490–94 (Utah 1997); *State v. Huggins*, 18 Utah 2d 219, 221, 418 P.2d 978, 979 (1966); *State v. Winget*, 6 Utah 2d 243, 244, 310 P.2d 738, 739 (1957); *State v. Torgerson*, 4 Utah 2d 52, 54, 286 P.2d 800, 801 (1955); *State v. Wellard*, 3 Utah 2d 129, 133, 279 P.2d 914, 917 (1955); *State v. Cooper*, 114 Utah 531, 535–36, 201 P.2d 764, 767 (1949); *State v. Scott*, 111 Utah 9, 20–22, 175 P.2d 1016, 1021–23 (1947); *State v. Nemier*, 106 Utah 307, 311–12, 148 P.2d 327, 329 (1944); *State v. Williams*, 36 Utah 273, 277–81, 103 P. 250, 252 (1909). We most recently addressed the rule in *State v. Decorso*, 1999 UT 57, ¶¶ 12–35, 992 P.2d 951. In *Decorso*, we limited prior statements of the rule articulated in *State v. Doporto*, 935 P.2d 484 (Utah 1997). Nevertheless, the basic concepts embodied in the rule limiting the use of prior crime evidence remain intact.

### B. Admissibility of the Preinformation October 1991 Evidence

¶ 16 We turn first to the issue of whether evidence of defendant's alleged abuse prior to October 1991 should have been admitted. Defendant's appellate counsel argues that the trial court committed plain error in admitting such evidence. The State counters that the trial court permitted the prosecutor's questions "about the uncharged 1991 sexual abuse, and that the prosecutor went beyond the scope of the permission only to clarify defendant's misleading testimony and to address issues the defendant raised."

¶ 17 The Court of Appeals acknowledged that the prosecutor went far beyond that scope and that throughout the trial, "the prosecutor referred to the 1991 episode." *Saunders*, 893 P.2d at 590. The court further observed:

Defendant primarily focuse[d] on comments made by the prosecutor during the State's case in chief and during closing argument to support his claim of prosecutorial misconduct. The prosecutor's comments were undeniably at odds with the [trial] court's order in that the prosecutor discussed details of the 1991 investigation. It also appears that these comments were used to imply defendant's guilt based on his prior acts, and, if viewed in isolation,

they might well constitute prosecutorial misconduct.

*Id.* (footnotes omitted).

1. *Pretrial Order Allowing Admission of Pre–October 1991 Evidence*

■ ¶ 18 Defendant made a pretrial motion in limine to exclude all evidence of defendant's alleged misconduct that occurred prior to the period charged in the information. The trial court denied defendant's motion. Instead, the court ruled that such evidence would be allowed and that "questioning about prior conduct would be allowed but not the details of the offenses in April of '91."

¶ 19 Defendant's motion to exclude clearly brought the issue of the admissibility of the 1991 evidence to the trial court's attention. The trial court's ruling denying defendant's motion and affirmatively allowing general evidence referring to 1991 conduct made unnecessary any further objection to that type of evidence by defense counsel so as to be able to raise the issue of the validity of the order on appeal, although counsel was still required to object to evidence of specific conduct in 1991. The denial of the motion to exclude the 1991 evidence obviated the necessity of defendant's objecting to the order generally; the trial court knew the basis of defendant's motion, and the court squarely rejected defendant's position as to general evidence of 1991 conduct. *See* Utah R.Crim. P. 20.

■ ¶ 20 In this Court, defendant has not directly challenged the trial court's ruling. Nevertheless, in light of the long line of cases set out above that prohibit the use of prior crime evidence to show criminal propensity, we hold that the trial court's pretrial order was patently erroneous as to general evidence of prior misconduct under the plain error doctrine and highly prejudicial. *See State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993) (discussing plain error).

2. *Prosecutor's Use of Preinformation Evidence at Trial*

■ ¶ 21 The Court of Appeals held that the admission of the preinformation evidence and the prosecutor's reliance on that evidence to show criminal propensity in his argument to the jury was justified because defendant "opened the door" to the admission of that evidence and the State merely used prior criminal conduct evidence to rebut Saunders' evidence. *See Saunders*, 893 P.2d at 591. A review of the evidence, however, demonstrates unequivocally that it was not defendant who "opened the door" to that evidence but that the State did so by adducing such evidence through several witnesses, beginning long before Saunders took the stand. Detective Mitchell, the State's first witness, then B.C., and then Debra Smith, B.C.'s mother, each referred to pre-October 1991 conduct. B.C. and Debra Smith testified to allegations of defendant's *specific* conduct to which defendant objected. In every instance, the objection was overruled. B.C., on direct examination by the prosecution, testified extensively to allegations of defendant's conduct and his use of Desitin in touching B.C. in some instances and not using it in others. All this testimony was given before Saunders took the stand.

¶ 22 Saunders, on direct examination in his defense, testified that he had touched B.C.'s private areas for the purpose of treating a rash with Desitin a maximum of five times, without specifying when those touchings occurred. On the prosecution's cross-examination, Saunders stated that every application of Desitin had occurred prior to October 1991. He also testified that he had not touched B.C.'s genital area at all during the period charged or at any time previous thereto except to treat his daughter's rash. Given the fact that the prosecution had already introduced a great deal of specific evidence related to 1991, Saunders clearly was entitled, indeed required as a practical matter, to rebut or explain that evidence by his testimony. To say that defendant "opened the door" and therefore was responsible for the admission of the 1991 evidence, as the State contends, is patently incorrect. The trial court and the Court of Appeals both fell into palpable error in so ruling. The prosecution did not limit its cross-examination to clarifying when the Desitin applications occurred; the prosecution went well

beyond that to explore its contentions as to the pre-October 1991 conduct of defendant.

¶ 23 The obviousness of the prosecution's error in going into the 1991 events was in fact recognized in open court by the prosecutor himself when, at the close of all evidence, he stated to the trial court:

> It would appear that the defendant admitted to some things happening during 1991, which could arguably be construed as sexual abuse, but which were outside the parameters charged by the State in the information, and which the court had earlier ruled, the State may not get into. We obviously violated the court's ruling in doing so.

Even in this Court, the State admits in its brief that "as authorized by the trial court's [pretrial] order, the State elicited non-detailed testimony about the 1991 sexual abuse from three of its witnesses during the State's case in chief." In addition, defendant did object when the prosecution made specific, detailed inquiry through B.C. and Debra Smith into Saunders' alleged 1991 conduct, as the trial court's order required. The trial court overruled those objections.

¶ 24 In sum, the State's inquiries into defendant's conduct in the 1991 period through the testimony of Detective Mitchell, B.C., and B.C.'s mother effectively forced defendant to respond in his direct examination regarding his conduct in that period. He testified that he had touched B.C.'s genital and buttocks areas for the purpose of applying Desitin and for no other purpose. If that testimony were true, his touching of B.C. on those occasions was not illegal because it was not done for an illicit purpose. The State, on cross-examination, then inquired further into his account of his conduct in the 1991 period, as it was entitled to do. If one focuses only on defendant's testimony, it can be said that his direct testimony opened the door to the cross-examination. But to view that testimony apart from the testimony of the preceding witnesses, who opened up the entire subject, is unrealistic and unwarranted. The subject of defendant's 1991 conduct had been referred to on numerous occasions by the prosecution's witnesses before defendant took the stand and

testified. Saunders clearly was entitled to rebut the charges that he had abused B.C. before the period charged without waiving his right to attack the pretrial order and the admission, over his objections, of those parts of B.C.'s testimony and Debra Smith's testimony pertaining to pre-October 1991 events, all of which already violated the principles stated in *Decorso*, 1999 UT 57, 992 P.2d 951, and rule 404(b) of the Utah Rules of Evidence. A defendant need not forego rebutting improperly admitted evidence to preserve his objection to that evidence. In *State v. Span*, this Court stated, "It would be unfair for a prosecutor to question a witness on prohibited information or issues, but then require the defendant to forego cross-examination, which could ameliorate the damage caused, to preserve an objection to the prosecutor's misconduct." 819 P.2d 329, 334 (Utah 1991).

*C. Argument to the Jury Based on Prior Crime Evidence*

¶ 25 Anchoring the principle that prior crime evidence is not admissible to show criminal propensity is the more fundamental principle that a prosecutor may never argue or suggest to the finder of fact, either directly or indirectly, that a defendant should be convicted because of his criminal character or that he was guilty of the crime charged because he acted in accord with a criminal propensity shown by such evidence. This is true regardless of whether that evidence was properly or erroneously admitted. A prosecutor who intentionally calls to jurors' attention matters that they should not consider in reaching a verdict is clearly guilty of misconduct, particularly when a prosecutor argues prior bad acts or prior criminal conduct as a basis for convicting. *See State v. Emmett*, 839 P.2d 781, 785–86 (Utah 1992); *State v. Tarafa*, 720 P.2d 1368, 1372–73 (Utah 1986).

¶ 26 Defendant argues that the Court of Appeals erred in ruling that the prosecution's closing argument to the jury was not plain error and not prosecutorial misconduct. The Court of Appeals reasoned that defendant's 1991 alleged conduct came into evidence because defendant opened the

door to it and that the prosecutor's argument therefore did not constitute misconduct. The Court of Appeals, in dealing with this aspect of the case, stated:

> Defendant primarily focuses on comments made by the prosecutor during the State's case in chief and during closing argument to support the claim of prosecutorial misconduct. The prosecutor's comments were undeniably at odds with the Court's order in that the prosecutor discussed details of the 1991 investigation. It also appears that these comments were used to imply defendant's guilt based on his prior acts, and, if viewed in isolation, they might well constitute prosecutorial misconduct.
>
> However, it was defendant, not the prosecutor, who initially introduced a detailed version of what proved to be the 1991 incidents. Defendant apparently chose to introduce this evidence as a matter of strategy, presumably to demonstrate that he touched his daughter for medicinal rather than sexual purposes, and thus lacked the requisite intent necessary to support a conviction for sexual abuse of a child.

*Saunders,* 893 P.2d at 590–91.

¶ 27  In view of our analysis of the evidence above, it is clear that the Court of Appeals erred in ruling that defendant opened the door to a detailed version of the 1991 evidence. The basis for its conclusion that there was no prosecutorial misconduct, therefore, is faulty.

■ ¶ 28  The test for determining whether a prosecutor's statements in closing argument are improper and constitute error is whether his remarks "call[ ] to the jurors' attention matters which they would not be justified in considering in reaching a verdict." *State v. Creviston,* 646 P.2d 750, 754 (Utah 1982); *see also Emmett,* 839 P.2d at 785. The trial court's error in allowing evidence of alleged prior criminal conduct was severely compounded by the prosecutor's urging the jury to convict on that basis.

¶ 29  The prosecutor's closing argument to the jury was replete with direct references to defendant's alleged 1991 conduct.

The prosecutor urged the jury to convict on the basis of the acts alleged to have occurred prior to October 1991 although the charge in the information covered only the period from October 1991 through June 1992. The prosecutor's argument with respect to preinformation conduct was clearly intended to prejudice the outcome. The prosecutor far exceeded appropriate prosecutorial zeal and seriously corrupted the integrity of the truth-finding function of the trial by his inexcusable disregard for fairness based on basic rules of evidence. For example, the prosecutor argued to the jury:

> "The State didn't even want to talk about all this stuff. We didn't charge him with anything until 1992. Do you know what happened? The 11th day of April, 1991, Det. Mitchell talks to this guy. Mitchell talks to the defendant right there. Where is that, 1991, April, bingo, right here (indicating).... What did they talk about? Well we don't know. We didn't get into that, did we, because we don't care, necessarily, except for one thing. I asked the defendant pointblank, 'So, your decision not to put Desitin on your daughter's vagina anymore had something to do with your talk with Det. Mitchell in April, on April 11, 1991, didn't it?' And he said yes. So he is on notice right here that the State is real interested in how he treats his daughter's vagina. And the presumption of innocence saved his bacon in 1991, and the State didn't do anything and nothing happened."

893 P.2d at 590 n. 6. The Court of Appeals correctly stated:

> Defendant primarily focuses on comments made by the prosecutor during the State's case in chief and during closing argument to support his claim of prosecutorial misconduct. The prosecutor's comments were undeniably at odds with the court's order in that the prosecutor discussed details of the 1991 investigation. *It also appears that these comments were used to imply defendant's guilt based on his prior acts, and, if viewed in isolation, they might well constitute prosecutorial misconduct.*

893 P.2d at 590 (emphasis added) (footnotes omitted).

¶ 30 It is true that Saunders made no objection to the prosecution's argument to the jury. Ordinarily, failure to object to improper remarks constitutes a waiver of the claim, "unless the remarks constitute plain error." *Emmett*, 839 P.2d at 785. In *Emmett*, we observed that an appellate court will review an allegation of plain error despite the lack of a timely objection if the trial court was not led into error. "We do so in order to avoid manifest injustice and because, if the error is obvious, the trial court has the opportunity to address the error regardless of the fact that it was never brought to the court's attention." *Id.* In this case, the prosecutor's closing argument constituted plain error.

¶ 31 Once again we observe that prosecutors have duties that rise above those of privately employed attorneys. As former Chief Justice Gordon Hall, himself a prosecutor prior to assuming the bench, observed in *Emmett*, "[P]rosecutors have a duty to eschew all improper tactics." *Id.* at 787. In *Emmett*, we quoted the following:

> "[A prosecuting attorney] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

*Id.* (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)).

## III. VOIR DIRE QUESTIONING TO EXPOSE BIAS AND FOR–CAUSE CHALLENGES OF JURORS

¶ 32 Defendant raises several issues that call in question the impartiality of the jury that convicted him. He asserts that the trial court erred in (1) prohibiting him from posing follow-up questions to answers of prospective jurors on voir dire to determine whether the answers that were given and that indicated a possibility of bias, if explored further, would require dismissal of the prospective juror for cause, and (2) ruling on a for-cause challenge to a juror.

### A. Restriction of Voir Dire Questions Intended to Explore Indications of Possible Bias

¶ 33 Voir dire questioning is essential to choosing an impartial jury, and an impartial jury is as essential to a fair trial as is an impartial judge. Indeed, the damaging effect of juror bias may be even more insidious than judicial bias because once biased jurors are seated, the effect of their bias is essentially undiscoverable and unremediable. By contrast, the rulings of a biased judge are usually made on the record, are subject to the scrutiny of counsel, and are reviewable by an appellate court. Those same safeguards do not exist with respect to jurors' decisions.

¶ 34 Accordingly, effective voir dire questioning of prospective jurors must not be prevented by a procedure designed to qualify jurors as quickly as possible on the basis of superficial questions and a declaration by each juror that he or she can follow the judge's instructions and decide the case fairly. In *State v. Worthen*, 765 P.2d 839 (Utah 1988), this Court declared that although a trial judge has discretion in limiting voir dire examination, that discretion must be "liberally exercised" *in favor* of allowing counsel to elicit necessary information for ferreting out bias, whether for a for-cause or a peremptory challenge. *Id.* at 845. *Worthen* made clear that the fairness of a trial may indeed depend upon the right of counsel to ask voir dire questions designed to discover and explore biases that would affect a juror's decision (even if such biases do not support a for-

cause challenge): "All that is necessary for a voir dire question to be appropriate is that it allow 'defense counsel to exercise his peremptory challenges more intelligently.'" *Id.* (quoting *State v. Ball,* 685 P.2d 1055, 1060 (Utah 1984)). The Court in *Worthen* concluded:

> Thus, trial counsel should be given considerable latitude in asking voir dire questions, especially in view of the fact that only counsel will, at the beginning, have a clear overview of the entire case and the type of evidence to be adduced. Voir dire should not be restricted to a "stark little exercise" which discloses little.

*Id.* at 845 (citations omitted). The term "stark little exercise" referred to the all too prevalent practice of avoiding any real inquiry into possible bias by a trial judge's asking a prospective juror if he or she could decide the case fairly and follow the law given by the judge and then taking a prospective juror's affirmative answer as dispositive of the issue of bias. The reason that such an exercise is inadequate for ferreting out bias was explained in *State v. Ball:*

> The most characteristic feature of prejudice is its inability to recognize itself. It is unrealistic to expect that any but the most sensitive and thoughtful jurors (frequently those least likely to be biased) will have the personal insight, candor and openness to raise their hand in court and declare themselves biased. Voir dire is intended to provide a tool for counsel and the court to carefully and skillfully determine, by inquiry, whether biases and prejudices, latent as well as acknowledged, will interfere with a fair trial if a particular juror serves in it.

685 P.2d at 1058.

¶ 35   Ruling that a prospective juror is qualified to sit simply because he says he will be fair ignores the common-sense psychological and legal reality of the situation. It is not uncommon for people to believe that their "biases" are in fact nonbiased objective judgments that are true and correct. Moreover, because a prospective juror cannot know much about the case at the time of voir dire, a juror cannot anticipate how he will react when asked to decide a case once all the facts are known.

¶ 36   We now make emphatically clear that a juror's statement alone that he or she can decide a case fairly pursuant to the law given by the trial court is not a sufficient basis for qualifying a juror to sit when the prospective juror's answers provide evidence of possible bias and the trial court does not allow further questions designed to probe the extent and the depth of the bias. Preventing such further inquiry and concluding the issue by taking a juror's conclusory statement that he or she will not be affected by a particular attitude or will decide the case fairly is not sufficient.

¶ 37   In the instant case, the jury's verdict turned almost solely on its assessment of the credibility of B.C. vis-a-vis the credibility of defendant. To determine who was more credible, the jury had to make a subjective assessment of the veracity of B.C. and defendant. The jurors had little objective evidence by which they could make that determination and therefore had to rely on a subjective evaluation of the witnesses' credibility that would be strongly influenced by the jurors' own experiences and points of view and the possible biases that arose from them. In such a case, it is acutely important that the trial judge allow a sufficiently detailed voir dire so that the jury chosen is as neutral as possible toward both the prosecution and the defense. That was not done in this case.

¶ 38   Saunders asserts that the trial court refused to allow defense counsel to investigate the possible bias of two jurors who stated they had specialized knowledge concerning child sexual abuse from their educational background and one juror who was actively supporting an anti-child-abuse organization. The Court of Appeals refused to address the issue, finding it "without merit." *Saunders,* 893 P.2d at 587 & n. 1. We disagree.

¶ 39   During voir dire, the prospective jurors were asked, "[A]re there any of you who have studied the subject of child sexual abuse?" In response, four jurors stated that they had specialized knowledge concerning

child sexual abuse. After some prospective jurors had been questioned in chambers concerning their experiences with abuse cases, defense counsel sought to question jurors Nissen, Broadhead, and Rigdon concerning their knowledge about sexual abuse issues. Juror Nissen stated that she had taken classes at Weber State University discussing sexual abuse of children and had worked in a women's therapy group with young girls who had been sexually abused. Juror Broadhead apparently had raised money for an anti-child-abuse organization, and juror Rigdon had taken classes relating to child sexual abuse. The trial court refused counsel's request to examine those prospective jurors further.

¶ 40  Defense counsel sought to determine how those jurors might be affected in deciding the case by virtue of their "specialized knowledge" of child abuse. The following exchange occurred:

MS. JOHNSON (defense counsel): All right. I would like to follow up then with a couple of questions.

THE COURT: Well, tell me what questions.

MS. JOHNSON: Your honor, these concern the specialized knowledge that people may have on the panel regarding sexual abuse education, sexual abuse therapy and—

THE COURT: We have covered that now.

MS. JOHNSON: *I am aware some people have specialized knowledge and I am interested in finding out what kind of role that might play in their deliberations.*

THE COURT: Well, I'm not going to put that to them. *I will ask if that experience would prevent them from being fair and impartial.*

(Emphasis added.) The trial court then asked jurors Broadhead and Rigdon if their previous experience would prevent them from being fair and impartial, to which each answered negatively.

¶ 41  In taking exceptions to the seating of the jury, defense counsel stated:

MS. JOHNSON: Yes, your honor. I would like to indicate for the record as well that we had a discussion regarding some individual voir dire on juror No. 4, No. 9, No. 10 regarding specialized knowledge of sexual abuse and sex abuse education. I would indicate the court refrained from allowing any individual voir dire of those specific jurors.

THE COURT: That was in chambers, not here.

MS. JOHNSON: Individual voir dire in chambers. The court allowed some questioning here and I would indicate that I have struck Ms. Nissen precisely because we cannot really get into the depth of her knowledge and the court did not want to do that, simply cut off that questioning, in my opinion. And on that basis, I struck Ms. Nissen, No. 4.

I believe I was unable to do anything other than that without fully appreciating the depth of her knowledge, and in a case like this where we are dealing with a sex abuse issue, specialized knowledge, of course, is extremely important in deciding where one might be as a juror. And on that basis, I struck her without being afforded an opportunity to have an individual voir dire and discuss that with her in chambers.

¶ 42  Defense counsel's attempt to determine whether these jurors' specialized knowledge of child abuse might have shown a bias that would affect their judgment in deciding the case was altogether legitimate. Even a limited probing of that subject might have disclosed bias sufficient to justify a for-cause removal or possibly a peremptory removal. It was the trial judge's duty to have allowed further questioning.

¶ 43  As a general rule, trial judges have some discretion in limiting voir dire inquiry. *See, e.g., Worthen,* 765 P.2d at 845. That discretion is most broad when it is exercised with respect to questions that have no apparent link to any potential bias. However, the trial judge's discretion narrows to the extent that questions do have some possible link to possible bias, and when proposed voir dire questions go directly to the existence of an actual bias, that discretion disappears. The trial court must allow such inquiries.

¶ 44 To be clear, the bias of which we speak is not necessarily a bias in favor of or against the prosecution, or in favor of or against the defendant, but a bias that would interfere in any manner with a juror's deciding evidentiary issues fairly and objectively and applying objectively the rules of law given to the jury by the trial judge.

¶ 45 When the trial judge in this case refused to probe the extent to which the jurors' prior knowledge and experience with child abuse issues might affect their view of the facts, he failed to examine whether those jurors' attitudes would bias their decisions or at least so affect them that defendant would deem it necessary to use his peremptory challenge.

¶ 46 That point is particularly critical in a case such as this because child sexual abuse is a matter of such overwhelming concern. Indeed, the courts have had some difficulty from time to time in dealing justly with emotionally charged evidentiary issues presented by such cases. *See State v. Bullock*, 791 P.2d 155, 161 (Utah 1989) (Stewart, J., dissenting). Some are inclined to accept without any hesitation a child's accusation of abuse, even in circumstances where false charges of abuse are known to occur. *See id.* at 163. To ignore current attitudes that may give rise to a biased perspective of the facts in a case is to invite injustice.

¶ 47 In sum, the trial judge abused his discretion in refusing to allow a further probing of the jurors' attitudes toward child sexual abuse, given their prior "specialized knowledge."

### B. Trial Court's Refusal to Grant For–Cause Challenge

¶ 48 Defendant also argues that the trial court committed reversible error by failing to remove juror Henline for cause. During voir dire, the trial court asked the prospective jurors if any of them had been victims of "incest or molestation." Henline responded affirmatively and during in-chambers questioning disclosed that approximately three years before trial, she had been sexually abused by a boyfriend. In response to the question whether she could be fair and impartial in deciding the case, she stated: "It

wouldn't prevent me. It might make me uncomfortable." She also stated that being a juror would bring up "uncomfortable memories, but it would not affect my ability to be fair and keep in remembrance he is innocent until proven guilty." She also disclosed that she had undergone therapy and counseling for the abuse. The trial court refused to excuse the juror for cause, and defense counsel removed her on a peremptory challenge.

¶ 49 The Court of Appeals ruled that the trial court did not err "because the prospective juror's comments did not create an inference of partiality or prejudice against defendant" and because the "juror was not the victim of a crime sufficiently similar to raise such an inference." *Saunders*, 893 P.2d at 587. The Court of Appeals also stated that defendant would have to "show that the failure to remove the juror actually prejudiced his case," citing *Menzies*, 889 P.2d at 398. *Saunders*, 893 P.2d at 587.

¶ 50 We address first the issue of whether the trial court should have dismissed the juror for cause. While it is correct that the crime of which she was a victim was technically different from the crime charged in this case, that is not dispositive. What is important is that she stated that her prior experience would make her uncomfortable in deciding this case. We certainly do not impugn her honesty and integrity when we refuse to take her answer to be dispositive of her qualification to sit. However, her forthright statement that she would be "uncomfortable" in deciding the case begs further investigation that the trial judge should have allowed. She made clear that deliberating on the facts in this case might well be affected by a consideration extraneous to the facts and law of this case. Whether that extraneous consideration would have weighed in favor of the prosecution or the defense is of no moment. What is important is that despite her sincere commitment to be fair, it was clearly possible that her personal traumatic experience might affect her neutrality in some way because, as she stated, making a decision would make her "uncomfortable" for reasons that went beyond the discomfort that many jurors experience when rendering judgment. It is also relevant that she had been the victim of

a relatively recent sexual offense and had required therapy in connection with that offense, and when asked by defense counsel if she had "dealt effectively" with that experience, she stated, "I feel I have dealt with it as much as I can."

¶ 51 Given her prior experiences, and absent any further exploration of her attitude, this juror should have been removed. We emphasize again that trial judges should err on the side of caution in ruling on for-cause challenges and that the scope of judicial discretion accorded a trial judge must be evaluated in light of the ease with which all issues of bias can be dispensed by the simple expedient of replacing a questionable juror with another whose neutrality is not open to question. *See Jenkins v. Parrish,* 627 P.2d 533, 536 (Utah 1981).

### C. Harmless Error Under State v. Menzies

¶ 52 *State v. Menzies,* 889 P.2d at 399–400, reversed prior case law and held that error in not removing a juror for bias on a for-cause challenge was not per se reversible error. *Menzies* held that for such an error to be reversible, actual prejudice had to be shown, and the expenditure of a peremptory challenge to remove a biased juror was not a sufficient showing of prejudice. *Id.*

¶ 53 Defendant argues that the *Menzies* rule should not apply in this case because *Menzies* was decided after the trial in this case. We reject this argument. The long-standing traditional rule is that the law established by a court decision applies both prospectively and retrospectively, even when the decision overrules prior case law. Only if retrospective application of a decision creates "a substantial injustice" will a court limit a new decision to prospective application. *Heslop v. Bank of Utah,* 839 P.2d 828, 835 (Utah 1992). A substantial injustice is often shown by an impairment of legal interests or expectations that have been created by reliance on the old law.

¶ 54 In this case, there was no reliance on pre-*Menzies* law. No legal interests were created as a result of the old rule. Because pre-*Menzies* law was a procedural rule only, there was no detrimental reliance on it, and

there is no injustice in applying that rule retroactively. We implicitly decided the retroactivity of *Menzies* in *State v. Carter,* 888 P.2d 629, 649 (Utah 1995), when we applied the *Menzies* rule in a case in which the trial took place prior to our decision in *Menzies.* We now explicitly hold that *Menzies* applies both prospectively and retrospectively.

¶ 55 Nevertheless, while *Menzies* abandoned the per se rule that the loss of a peremptory challenge because of an erroneous denial of a for-cause challenge is reversible error, *Menzies* did not foreclose all consideration of erroneous for-cause rulings in determining whether there is sufficient prejudice in the circumstances of the case to require a reversal of a conviction. *Menzies* held that a defendant had to demonstrate prejudice. *See* 889 P.2d at 398–400. To that end, we will take into account on a cumulative basis all erroneous rulings with respect to rulings on voir dire and for-cause challenges for the purpose of determining whether there is reversible error. In our view, the trial court's undue limitations on voir dire questions and the trial court's refusal to strike juror Henline are sufficiently cumulative to raise a reasonable question as to the neutrality of the jury and to constitute reversible error.

### IV. ARTICLE I, SECTION 10 OF THE UTAH CONSTITUTION: JUROR UNANIMITY

¶ 56 Instruction 26 was intended to address the jury unanimity requirement under Article I, section 10 of the Utah Constitution. Defendant contends that the instruction was erroneous because it potentially allowed the jury to find guilt without being unanimous about what unlawful act defendant committed. Because defense counsel made no objection to the instruction, defendant argued in the Court of Appeals that the instruction constituted plain error. The Court of Appeals addressed the issue under the plain error doctrine and held that "[r]egardless of whether Instruction No. 26 was actually erroneous, we cannot conclude that the instruction would have been *obviously* erroneous." *Saunders,* 893 P.2d at 588–89 (footnote omitted). The Court of Ap-

peals, therefore, did not reach the merits of the Article I, section 10 issue. In this Court, defendant argues that the Court of Appeals erred in ruling that whatever error there was in the instruction was not "plain," that the court should have reached the merits of defendant's claim, and that instruction 26 was given in error.

■ ¶ 57 Plain error exists when the error should have been obvious to the trial court and the error is of such magnitude that there is a reasonable likelihood of a more favorable outcome for the defendant. *See Dunn*, 850 P.2d at 1208–09. Thus, in deciding whether there was error in instruction 26, we must also determine the nature and likely impact of that error.

¶ 58 Instruction 26 stated:

Before the jury arrives at a guilty verdict, the law requires that each of the jurors be satisfied beyond a reasonable doubt that *an act* alleged in the Information occurred. *There is no requirement that the jurors be unanimous about precisely which act occurred or when or where the act or acts occurred.* The only requirement is that each juror believe, beyond a reasonable doubt, that *at least one prohibited act occurred* sometime between October of 1991 and May of 1992, in Salt Lake County, involving the victim and the defendant.

(Emphasis added.)

■ ¶ 59 The principle that jury verdicts must be unanimous is a fundamental tenet of criminal law. Article I, section 10 of the Utah Constitution specifically provides: "In criminal cases the verdict shall be unanimous." This Court has recognized that principle in a long line of cases. *See, e.g., Tillman v. Cook*, 855 P.2d 211, 216 (Utah 1993); *State v. Standiford*, 769 P.2d 254, 257–58 (Utah 1988); *State v. Barlow*, 8 Utah 2d 396, 398–400, 335 P.2d 629, 630–31 (1959); *State v. Thompson*, 110 Utah 113, 119–21, 170 P.2d 153, 156–57 (1946); *State v. Bleazard*, 103 Utah 113, 119, 133 P.2d 1000, 1002 (1943); *State v. Rasmussen*, 92 Utah 357, 376, 68 P.2d 176, 185 (1937).[3]

■ ¶ 60 The Article I, section 10 requirement that a jury be unanimous is not met if a jury unanimously finds only that a defendant is guilty of a crime. For example, if a jury were given no elements instructions, a unanimous guilty verdict would not meet the requirements of Article I, section 10. Nor would a guilty verdict be valid if some jurors found a defendant guilty of robbery while others found him guilty of theft, even though all jurors agree that he was guilty of some crime. Nor would a verdict be valid if some jurors found a defendant guilty of a robbery committed on December 25, 1990, in Salt Lake City, but other jurors found him guilty of a robbery committed January 15, 1991, in Denver, Colorado, even though all jurors found him guilty of the elements of the crime of robbery and all the jurors together agreed that he was guilty of some robbery. Jury unanimity means unanimity as to a specific crime and as to each element of the crime. However, because time itself is

---

3. A minor variation on the unanimity rule was recognized in *State v. Russell*, 733 P.2d 162, 165–69 (Utah 1987). The Court ruled that the jury need not unanimously agree on which of three possible formulations of the necessary mens rea had been proved as long as all jurors agreed that at least one of the three had been proved. The three mental states were (1) "intentionally or knowingly caus[ing] the death of another"; (2) "intend[ing] to cause serious bodily injury to [another] commit[s] an act clearly dangerous to human life that caus[es] the death of another"; and (3) "act[ing] under circumstances which evidenced a depraved indifference to human life ... engag[es] in conduct which creat[es] a grave risk of death to another and thereby caus[es] the death of [another]." *Id.* at 164; *see also State v. Powell*, 872 P.2d 1027, 1032 (Utah 1994); *State v. Goddard*, 871 P.2d 540, 546–47 (Utah 1994).

The lead opinion in *Russell* represented the views of only two justices. A separate concurring opinion written by Justice Stewart held that unanimity was not required with respect to the statutory mens rea element of second degree murder but only because the varying mental states specified for the three different aspects of second degree murder were essentially the same; indeed, at common law they were all described by the term "malice aforethought." *See Russell*, 733 P.2d at 169–75 (Stewart, J., concurring separately). The lead opinion specifically made clear that the decision was limited to the proposition that the defendant was not entitled to unanimity on the specific second degree murder mens rea and "did not express any opinion on the necessity of unanimity in other situations not present in this case." *Id.* at 167.

not an element of an offense, *see State v. Distefano*, 70 Utah 586, 595, 262 P. 113, 116 (1927); *State v. Crawford*, 60 Utah 6, 14, 206 P. 717, 720 (1922); *State v. Sheffield*, 45 Utah 426, 433–39, 146 P. 306, 308–11 (1915); *State v. Moore*, 41 Utah 247, 252–54, 126 P. 322, 324 (1912), it is not necessary that the jurors unanimously agree as to just when the criminal act occurred. Thus, a jury can unanimously agree that a defendant was guilty of a particular act or acts that constituted a crime even though some jurors believed the crime occurred on one day while the other jurors believed it occurred on another day.

¶ 61   Because defendant did not object to instruction 26 at trial, the Court of Appeals was limited to a plain error analysis of the validity of that instruction. That court held that the instruction was not plainly erroneous because Utah cases on jury unanimity provided no uniform rule that would have made it obvious to the trial court that instruction 26 would be erroneous. *See Saunders*, 893 P.2d at 589. For that proposition, that court cited *State v. Russell*, 733 P.2d 162 (Utah 1987), and *State v. Tillman*, 750 P.2d 546, 562–68, 577–80, 585–88 (Utah 1987), which the Court of Appeals thought indicated a division of views among justices as to whether a jury must unanimously agree on specific aggravating circumstances necessary to support a first degree murder conviction. *See Saunders*, 893 P.2d at 589. The Court of Appeals has misread *Russell* and *Tillman*. As indicated above, *Russell* addressed the necessity of unanimity in a second degree murder case that involved slight variations of the mens rea, which under the common law from which the second degree murder concept had emerged, had been dealt with simply as the single concept of "malice aforethought." *See Standiford*, 769 P.2d at 258–59. Furthermore, and more importantly, the Court of Appeals misread the opinions in *Tillman*. Contrary to that court's reading of the opinions, three justices clearly indicated agreement on the fundamental proposition

that unanimity was necessary as to all elements of an offense. The only disagreement among those three was whether the instructions in that particular case in fact required less than unanimity as to the various elements of the offense. Given Utah case law on the issue of jury unanimity, it is clear that the trial court should have been aware of the defects in instruction 26.

¶ 62   There are two obvious errors in instruction 26. First, notwithstanding a clear constitutional command and applicable case law, the instruction does not set out any unanimity requirement at all. The jury is not told that it must be unanimous about anything. In fact, the instruction states that the jury need not be unanimous. That is patent error. The jury could have returned a guilty verdict with each juror deciding guilt on the basis of a different act by defendant.[4] On this point, it was manifest error under Article I, section 10 of the Utah Constitution not to give a unanimity instruction.

¶ 63   The Court of Appeals held that instruction 26 was not plain error because the error was not obvious. It thought the error was not obvious because it misread our case law in particular, our holding in *Tillman*, 750 P.2d at 562–68; *id.* at 577–80 (Stewart, J., concurring & concurring in the result); *id.* at 585–88 (Durham, J., concurring & dissenting). The Court of Appeals stated that *Tillman* indicated a division of views among a majority of this Court as to whether a jury instruction may inform the jury that it may convict if the jurors do not unanimously agree on which alternative elements of an offense were committed as long as they agree with the ultimate conclusion that the defendant is guilty. The Court of Appeals stated, "Given the Utah Supreme Court's struggle in dealing with the unanimity problems, we cannot say that any error the trial court committed in instructing the jury that it need not unanimously agree on which spe-

---

4.   An erroneous instruction may be plain error or even manifest error, in which case we will address the validity of the instructions. *State v. Waid*, 92 Utah 297, 307–09, 67 P.2d 647, 651–52 (1937); *State v. Cobo*, 90 Utah 89, 100–04, 60 P.2d 952, 957–59 (1936). To establish plain error, a defendant must show that (1) the instruc-

tion was erroneous; (2) the error should have been obvious to the trial court; and (3) but for the error, there would be a "reasonable likelihood for a more favorable outcome for the defendant." *State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993).

cific act of sexual abuse defendant committed ... would have been obvious to the trial court." *Saunders*, 893 P.2d at 589.

¶ 64  The Court of Appeals badly misread the opinions of the justices in *Tillman*. Three justices held that the jury did have to agree unanimously on which specific aggravating circumstances—an element of a capital homicide offense—had been committed. The only disagreement among the three majority justices on that point was whether the instructions given the jury actually complied with that requirement. Justices Zimmerman and Durham thought the instructions did not meet that requirement. Justice Stewart thought otherwise. There was, however, no disagreement among Justices Durham and Zimmerman and Stewart as to the proposition that there had to be unanimity as to each specific aggravating circumstance. In other words, *Tillman* held that a guilty verdict was not valid if some jurors found one aggravating circumstance and other jurors found another aggravating circumstance; it was not enough that they simply unanimously agree on guilt.

¶ 65  Instruction 26 violated the constitutional requirement of jury unanimity. It stated that "there is no requirement that the jurors be unanimous about precisely which act occurred or when or where the act or acts occurred. The only requirement is that each juror believe, beyond a reasonable doubt, that at least one prohibited act occurred sometime between October of 1991 and May of 1992." Thus, some jurors could have found touchings without the use of Desitin to have been criminal; others could have found the touchings with Desitin to have been criminal; and the jurors could have completely disagreed on when the acts occurred that they found to have been illegal. Furthermore, given the factual issues in the case, we are not persuaded that the jury would have unanimously convicted had the error not existed.

¶ 66  Reversed and remanded for further proceedings.

¶ 67  Associate Chief Justice DURHAM concurs in Justice Stewart's opinion.

¶ 68  Justice RUSSON concurs in the result.

HOWE, Chief Justice, concurring and dissenting:

¶ 69  I concur in the reversal of the defendant's conviction and the ordering of a new trial. I concur in Part I of the majority opinion and in Parts II A and C. I concur in the result of part II B.

¶ 70  As to Part III, I concur in A and B, but dissent as to C. As to Part IV, I concur in the result.

ZIMMERMAN, Justice, concurring and dissenting:

¶ 71  I join in the reversal of the conviction. However, I do so on only some of the grounds stated in the opinion of Justice Stewart. Because of the length of the opinion and its many analytical subparts, I will set out my points of agreement and disagreement by reference to the organization of Justice Stewart's opinion. I do not join in any part of Justice Stewart's opinion not expressly mentioned in this separate opinion.

¶ 72  With respect to the admissibility of the October 1991 evidence, considered in part II subsection B2, I agree that defendant did not "open the door" to the 1991 uncharged conduct. Therefore, it should not have been admitted.

¶ 73  With respect to the prosecution's closing argument based on the prior crime evidence considered in part II subsection C, I agree that the closing argument was improper and constituted error. I also agree that this argument constituted plain error.

¶ 74  Regarding the voir dire questioning, considered in part III, I concur in the result reached in subsection A—that the trial court should have permitted questions regarding specialized knowledge of two jurors concerning child sexual abuse, and I also agree that failing to permit the questioning was an abuse of discretion. With respect to the refusal to grant a for-cause challenge, addressed in subsection B, I dissent. I do not agree that the trial court erred in refusing

the challenge to a prospective juror who, after full disclosure of her sexual abuse by a boyfriend some years earlier, responded that she could be fair and impartial although she might be uncomfortable. The juror was quite clear under questioning that "uncomfortable memories ... would not affect my ability to be fair and keep in remembrance he is innocent until proven guilty." The trial court saw the juror and judged her demeanor. This court is in no position to conclude from the cold record that the juror was mistaken and could not in fact fairly judge the case.

¶ 75 Defendant is entitled to a fair jury, not a perfect one. It is the trial judge's duty to assure that the jury is fair and this court's duty only to reverse the trial judge for an abuse of discretion.

¶ 76 Regarding the discussion of *State v. Menzies* in subpart C, I concur that *Menzies* does apply to this case. However, because I do not agree that the failure to strike for cause the prospective juror was error, I cannot agree that it is reversible error. I also dissent from the majority's conclusion that the cumulative error in the jury selection process was sufficient under *Menzies* to warrant reversal because while I agree that it was error to refuse to permit in-depth questioning about the specialized sexual abuse knowledge of the two other prospective jurors, that error is not enough alone to be prejudicial under *Menzies*.

¶ 77 Regarding the analysis in part IV of article I, section 10 of the Utah Constitution and the claim that the jury instruction on unanimity was plain error and a basis for reversal, I dissent.

¶ 78 The test for plain error was spelled out by this court in *State v. Dunn*, 850 P.2d 1201 (Utah 1993). We held that:

> to establish the existence of plain error and to obtain appellate relief from an alleged error that was not properly objected to, the appellant must show the following: (i) An error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined.

*Id.* at 1208–09. To meet that test, the law on jury unanimity would need to be clear so that the trial judge can properly be charged with knowledge of it. No fair review of our case law regarding juror unanimity could result in the conclusion that the proper rules are obvious. Absent true clarity in our law, a trial judge should not be reversed because we later conclude, as Justice Stewart has, that there is some way to reconcile our various prior decisions. This is particularly true in an area where, as here, the majorities in our prior cases have been badly fractured. *See State v. Eldredge*, 773 P.2d 29, 36 (Utah 1989) (holding that the obviousness of an error is hard to determine where there is no settled appellate law on point); *State v. Emmett*, 839 P.2d 781, 786 (Utah 1992) (relying on the "clarity of the law in this area" to find that error should have been obvious); *State v. Baker*, 963 P.2d 801, 805 (Utah Ct.App. 1998) (refusing to find plain error where there is no settled case law in the state).

¶ 79 In conclusion, I concur in the result. I would reverse the conviction on the grounds that the evidence of the 1991 conduct should not have been admitted and that it was reversible error to permit closing argument to the jury based on that evidence. I would not reverse on the basis of any errors in the voir dire process.