1999 Utah Ct. App. 368

**STATE of Utah, Plaintiff and Appellee,**

v.

**John LELEAE, Defendant and Appellant.**

**No. 981189–CA.**

Court of Appeals of Utah.

Dec. 9, 1999.

Lisa J. Remal and Robert K. Heineman, Salt Lake Legal Defender Assn., Salt Lake City, for Appellant.

Jan Graham, Atty. Gen., and Kenneth A. Bronston, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before WILKINS, P.J., GREENWOOD, Associate P.J., and DAVIS, J.

## OPINION

GREENWOOD, Associate Presiding Judge:

¶ 1 Defendant was convicted of aggravated assault in violation of Utah Code Ann. § 76-5-103 (1995), and the trial court imposed an enhanced sentence under Utah Code Ann. § 76-3-203.1(1) (1999). Defendant appeals, arguing (1) insufficient evidence supported his conviction; (2) errors during voir dire precluded a fair trial; (3) the trial court erred when it refused to allow defendant to introduce the entire statement he made to the police; (4) the gang enhancement statute is unconstitutional; and (5) the trial court failed to properly sentence defen-

dant under the *Shondel* doctrine.[1]  We affirm defendant's conviction for aggravated assault, but vacate his enhanced sentence and remand for resentencing on the aggravated assault conviction.

## RELEVANT FACTS

¶ 2 " 'In reviewing a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict.  We recite the facts accordingly.' "  *State v. Kiriluk*, 975 P.2d 469, 470 (Utah Ct.App.1999) (quoting *State v. Hamilton*, 827 P.2d 232, 233–34 (Utah 1992)).

¶ 3 On May 10, 1997, Kenny Brems, the victim, was driving his truck eastbound on 3500 South Street in West Valley City, Utah, when he noticed a blue Monte Carlo to his right.  The road narrowed from four to two lanes, one in each direction, as both cars approached 4400 West Street.  At that point, Brems heard two "pops" in close succession and turned down his radio to listen more closely.  Brems then heard a third pop, at which instant his rear window shattered.  Brems realized the popping sounds were gunfire and that someone in the Monte Carlo was shooting at him.

¶ 4 The road then widened back into four lanes.  To prevent the Monte Carlo from pulling along side his truck, Brems backed into the Monte Carlo, pushing it into another car behind it.  At that point, Brems's truck stalled, but he was too scared to restart it.  He got out of his truck and ran down 3500 South Street to escape and get help.  At the same time, he saw three men get out of the Monte Carlo.  One of the men, whom Brems later identified as defendant, had a gun.  The other two men were Edwin Seumanu and his brother, Viliamu Seumanu.

---

1.  In *State v. Shondel*, 22 Utah 2d 343, 453 P.2d 146, 147–48 (Utah 1969), the Utah Supreme Court held that when two statutes proscribe the same criminal conduct, the lesser of the two punishments should be imposed.  The inquiry under *Shondel* focuses on " 'whether the ... statutes at issue proscribe *exactly* the same conduct, i.e., do they contain the *same elements?* ' "  *State v. Kent*, 945 P.2d 145, 147 (Utah Ct.App. 1997) (alteration in original) (citation omitted).

" '[W]hen two statutes under consideration do not proscribe the same conduct, ... [the] defendant may be charged with the crime carrying the more severe sentence,' even if the defendant *could have been* charged with the crime carrying the less severe sentence, so long as there is a rational basis for the legislative classification."  *Id.* (quoting *State v. Clark*, 632 P.2d 841, 844 (Utah 1981)).

¶ 5 As he ran down the street, Brems tried unsuccessfully to get several drivers to call the police. He finally found Earl Bramhall, who was already calling the police from his cellular phone in his stopped vehicle. Brems felt more secure and stood by Bramhall's car, but he did not notice that the three men had climbed back into the Monte Carlo. The Monte Carlo pulled around Brems's truck, ran over some barricades, and bore down on Brems. Bramhall saw the Monte Carlo approaching Brems and yelled, "Look out! Look out!" Brems turned to see the Monte Carlo rushing toward him. He tried to jump out of the way, but the Monte Carlo struck him in the thigh, knocking him to the ground.

¶ 6 The Monte Carlo stopped, and defendant and one of the Seumanu brothers got out of the car. Defendant was still holding a gun. The men approached Brems, and the Seumanu brother asked why Brems had backed into their car. Brems responded, "Because you were shooting at me." Just then, the other Seumanu brother got out of the Monte Carlo. After that, Brems remembers only being beaten and begging for his life. He does not recall whether defendant was hitting him, only that the person who initially accompanied defendant began the beating and that he was assaulted by more than one person.

¶ 7 Several people witnessed the incident. Bramhall, the driver who called the police from his cellular phone, testified he saw defendant participate in the beating. Kevin Lubbers, the driver of the vehicle into which Brems pushed the Monte Carlo, was not close enough to see which of the Monte Carlo's occupants assaulted Brems, but he did testify "that they were all beating up on this guy." Another driver who had stopped his car recalled he saw three or four men exit the Monte Carlo, chase Brems as he limped away, and then beat him. He did not see any of the assailants try to stop the assault.

¶ 8 The first police officer to arrive at the scene was Officer William McCarthy. He saw a woman leading Brems away and what appeared to be three Polynesian men, whom he later identified as defendant and the Seumanu brothers, fighting with two other Islanders wearing Delta airline uniforms. The men in the airline uniforms were attempting to restrain defendant and his two cohorts.

¶ 9 Officer Julia Jorgenson arrived moments after Officer McCarthy. She saw a group of five Polynesians and two Caucasians by a chain-link fence on the roadside. Two of the Polynesians were wearing airline baggage-handler-type uniforms, while the other three—one of whom was defendant—were wearing baggy clothing. Knowing that she had been dispatched to a shooting incident, Officer Jorgenson looked for a gun and immediately retrieved a .44 magnum revolver from the passenger seat of the Monte Carlo. She also found five spent shell casings in the car.

¶ 10 Detective Kevin Nudd was assigned to investigate the incident. After visiting the scene of the assault, he interviewed defendant at the West Valley City police station. Defendant initially claimed he was only a bystander and denied any involvement in the assault. Defendant's story changed, however, after Detective Nudd told him that the conversation between defendant and one of the other assailants had been recorded as both suspects were detained in the police car. Defendant then admitted being with the Seumanu brothers but claimed he had only met them that evening. He stated they had all been drinking beer in a park, and that Edwin Seumanu, the owner and driver of the Monte Carlo, agreed to give defendant a ride. Defendant drove the Monte Carlo because Edwin was intoxicated.

¶ 11 Defendant was thus driving Edwin's Monte Carlo when they encountered Brems. Defendant's testimony was that he "accidentally" cut off Brems and that Brems retaliated by cutting off the Monte Carlo. Edwin Seumanu then began firing a gun. After Brems backed into the Monte Carlo, defendant stated he got out of the car to allow Edwin's brother, Viliamu, who was in the back seat, to get out of the two-door car. Defendant retrieved the gun from Edwin as Edwin got out of the Monte Carlo, before Edwin and his brother began chasing Brems. After failing to catch Brems, the Seumanu brothers returned to the Monte Carlo. This time, however, Edwin was behind the wheel. Edwin maneuvered the Monte Carlo around

Brems's truck and drove into Brems. Defendant asserted the Seumanu brothers then got out of the vehicle and began to assault Brems. Defendant claimed he tried to pull Edwin and Viliamu off Brems but denied he was involved in the beating.

¶ 12 Edwin Seumanu's story differed a bit from defendant's. Edwin asserted that he had, indeed, allowed defendant to drive. He claimed it was Brems who had cut off the Monte Carlo and thus had provoked Edwin to shoot a gun, which had been kept underneath the driver's seat, "straight up in the air." After Brems backed his truck into the Monte Carlo, Edwin stated that he and defendant got out of the car to pursue Brems. That chase was abandoned, however, and Edwin returned to the driver's seat of the Monte Carlo. Edwin also testified he could not remember what defendant was doing during the attack on Brems, but that it was two other Polynesians in uniforms, not defendant, who pulled the Seumanu brothers off Brems.

¶ 13 As a result of the assault, Brems's jaw was broken, and he suffered several minor head injuries. To treat his broken jaw, doctors surgically wired his jaw shut and removed a front tooth so he could ingest liquified food through a straw. Recovery for Brems was difficult. He found it hard to eat through the straw and was unable to eat solid food. As a result, Brems lost twenty pounds and was continuing to lose a pound a day when doctors removed the wires. It was not until two to three weeks later that Brems was able to eat solid food again.

¶ 14 Brems's jaw healed in six weeks, which is the normal healing time for such an injury. One week after doctors removed the wires from Brems's jaw, they replaced his tooth. At the time of trial, six months after the incident, Brems had gained back all but five pounds of the weight he had lost. Although Brems's jaw fully healed, the pain

still makes it difficult for him to hold a small flashlight between his teeth, as he had done previously for his work as a serviceman.

¶ 15 Defendant was charged and tried for attempted criminal homicide, or in the alternative, aggravated assault. A jury returned a guilty verdict against defendant on the aggravated assault charge. The trial court found that defendant acted "in concert" with two others to commit the assault and sentenced defendant to a prison term of six to fifteen years, pursuant to Utah's gang enhancement statute. *See* Utah Code Ann. § 76–3–203.1 (1995).[2] Defendant then filed this appeal.

## ANALYSIS

### I. Sufficiency of the Evidence

¶ 16 The first issue we address is whether the evidence was sufficient to support defendant's conviction for aggravated assault. We conclude it was.

¶ 17 " 'We review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury.' " *State v. Hawkins,* 967 P.2d 966, 971 (Utah Ct.App.1998) (quoting *State v. Hamilton,* 827 P.2d 232, 236 (Utah 1992) (additional citation omitted) (alteration in original)). Reversal of a jury conviction based on insufficient evidence is warranted "when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *Id.*

¶ 18 In Utah, a person commits aggravated assault by intentionally causing "serious bodily injury." Utah Code Ann. § 76–5–103(1)(a) (1999). Serious bodily injury, the most severe type of bodily injury in Utah's three-tiered scheme,[3] is defined as

2. We refer to section 76–3–203.1 as the "gang" enhancement statute, although the Legislature did not create a "gang" enhancement. *See State v. Lopes,* 980 P.2d 191, 192 n. 1 (Utah 1999). A more accurate description of the statute would be a "group criminal activity" enhancement. *See id.* As the *Lopes* court noted, however, the statute is popularly known as the gang enhance-

ment statute, and we will refer to it by that name. *See id.*

3. Utah's criminal code defines bodily injury in three ways. "Bodily injury," the least severe of the three, "means physical pain, illness, or any impairment of physical condition." Utah Code Ann. § 76–1–601(3) (1999). An intermediate lev-

"bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death." *Id.* § 76–1–601(10) (1999). Defendant contends no reasonable person could conclude the victim's injuries (in this case, a broken jaw that healed normally) constituted serious bodily injury. At most, defendant argues, the evidence supports a finding that the victim suffered "substantial bodily injury," the intermediate level of injury under the three-tiered scheme. *Id.* § 76–1–601(11).

¶ 19 Substantial bodily injury is defined as an "injury, not amounting to serious bodily injury, that creates or causes protracted physical pain, temporary disfigurement, or temporary loss or impairment of the function of any bodily member or organ." *Id.* § 76–1–601(11). Defendant asserts a broken jaw that heals normally is only a temporary injury and not the type of serious, permanent injury contemplated by the definition of "serious bodily injury." He thus argues the trial court erred by submitting the aggravated assault charge to the jury.

¶ 20 We conclude, however, the question was properly submitted to the jury under the facts of this case. Although the victim's injuries conceivably could have amounted to substantial bodily injury rather than serious bodily injury, reasonable minds could conclude a broken jaw that is wired shut for six weeks with resulting eating difficulties, weight loss, extraction and later replacement of a tooth, and continuing pain is a "protracted loss or impairment of the function of [a] bodily member." *Id.* § 76–1–601(10). That determination was properly put before the jury to decide. We therefore affirm the trial court's ruling on this matter.

## II. Voir Dire

¶ 21 Defendant next attacks the trial court's rulings concerning voir dire. Specifically, he contends the trial court improperly excluded three of defendant's proposed voir dire questions and erred by not granting

defendant's for-cause challenge of a jury pool member. We address each of these challenges in turn.

### A. Voir dire questions

¶ 22 Voir dire serves a dual purpose: (1) to uncover biases or prejudices of potential jurors to support a for-cause challenge; and (2) to produce information helpful to counsel in making intelligent peremptory challenges. *See Rasmussen v. Sharapata,* 895 P.2d 391, 394 (Utah Ct.App.1995) (citing *Barrett v. Peterson,* 868 P.2d 96, 98 (Utah Ct.App.1993)). Although "questions covering possible bias of jurors must cover the subject involved, the questions asked of jurors do not need to follow any specific formula to pass constitutional muster." *State v. James,* 819 P.2d 781, 797 (Utah 1991) (citations omitted). Defendant maintains the rejected questions were necessary because the trial court's management of voir dire did not adequately uncover biases or provide counsel with useful information upon which to base peremptory challenges.

¶ 23 "We review defendant's challenge to the trial court's voir dire for an abuse of discretion." *State v. Vigil,* 922 P.2d 15, 25 (Utah Ct.App.1996) (citing *Barrett,* 868 P.2d at 98). The scope of the trial court's discretion in this matter is broad; however, the " 'discretion must be exercised in favor of allowing discovery of biases or prejudice in prospective jurors.' " *Id.* (citation omitted). If the proposed question "directly relate[s] to bias and prejudice," the scope of the trial court's discretion "is strictly limited." *State v. Piansiaksone,* 954 P.2d 861, 868 (Utah 1998). That discretion increases, however, as the direct relationship of the question to bias and prejudice decreases. *See id.*

¶ 24 In addition, "[w]e will not disturb 'a trial court's discretionary rejection of voir dire questions' unless the trial court abused its discretion and the abuse ' "rose to the level of reversible error." ' " *Vigil,* 922 P.2d at 25 (citations omitted). We may reverse a trial court's ruling concerning voir

---

el, added in 1995, and discussed in the text above, is "substantial bodily injury." *Id.* § 76–1–601(11). "Serious bodily injury," the most se-

vere type of bodily injury, is the basis for an aggravated assault charge. *Id.* §§ 76–1–601(10); 76–5–103.

dire if, "after reviewing the totality of the questioning, we conclude that trial counsel was not given 'an adequate opportunity to gain the information necessary to evaluate jurors.'" *Id.* (citations and additional quotation marks omitted).

### 1. Question 26

¶ 25 Defendant insists Question 26, which asks, "If Mr. Leleae were to testify, would you give his testimony the same weight and credit that you would give to any other witness?" was critical to discovering a potential jury member's bias against defendant. Defendant was *not* like other "various witnesses," he argues, because he alone was charged with the crime the prosecution was trying. Thus, defendant contends he was entitled to inquire into any bias regarding his status as a charged criminal.

¶ 26 We agree with defendant that the objective of Question 26 was proper; a judge should allow questions purporting to discover possible biases against a defendant as a witness. The form of the question, however, improperly suggests a different basis for evaluating a defendant's testimony than that of other witnesses. The trial court thus did not abuse its discretion in excluding the question, and, instead, properly instructed the jurors that they were "to fairly and impartially listen to ... determine the credibility [and] weight" of each witness's testimony.

### 2. Question 41

¶ 27 We next address whether the trial court properly excluded Question 41. That question would have asked potential jurors,

> If, after hearing the evidence, you came to the conclusion that the prosecution had not proven the guilt of the accused beyond a reasonable doubt, and you found that a majority of the jurors believed the defendant was guilty, would you change your verdict only because you were in the minority?

¶ 28 The subject of Question 41, however, does not directly inquire about possible prejudice or bias. Thus, the trial court's discretion in admitting or excluding the question was quite broad. *See Piansiaksone,* 954

P.2d at 868. In fact, the trial court adequately covered the subject of Question 41 when it instructed potential jurors they must keep an open mind and evaluate the evidence fairly and impartially. No potential juror indicated he or she could not follow that admonition. We conclude the trial court did not abuse its discretion in excluding Question 41 from voir dire.

### 3. Question 49

¶ 29 Last, defendant asserts Question 49 was necessary to discover if the potential jurors would follow the court's instructions. Question 49 would have asked the following:

> You will later be instructed by the judge that the identification of a person as· the perpetrator of a crime is an expression of belief or impression by the witness, and that many factors affect the accuracy of the identification. Do any of you believe that an eyewitness can never make a mistake? Would any of you be unable to follow the judge's instruction about looking at various factors which could affect the accuracy of eyewitness identification?

¶ 30 As we see it, Question 49 does not directly address a possible prejudice or bias and was a thinly veiled attempt to ferret out which jurors were more likely to believe defendant's theory of the case. Our supreme court has upheld a trial court's refusal to ask a similar question, even when it was properly within the scope of voir dire. *See id.* The trial court in this case, therefore, had "the greatest degree of freedom to exclude" the question, *id.,* and properly did so.

### B. For-cause Challenge

¶ 31 Defendant also argues the trial court improperly denied defendant's for-cause challenge of jury pool member Steven Wright. Again, we review the trial court's action for an abuse of discretion. *State v. Cox,* 826 P.2d 656, 659 (Utah Ct.App.1992) ("'A motion to dismiss a prospective juror for cause is within the sound discretion of the trial court. When reviewing such a ruling, we reverse only if the trial court has abused its discretion.'" (quoting *State v. Woolley,*

810 P.2d 440, 442 (Utah Ct.App.1991))). We note defendant's argument that he was compelled to use a peremptory strike because the trial court refused to excuse a jury panel member for cause is no longer sufficient to establish reversible error. "To prevail on a claim of error based on the failure to remove juror for cause, a defendant must demonstrate prejudice, viz., show that a member of the jury was partial or incompetent." *See State v. Menzies,* 889 P.2d 393, 398 (Utah 1994) (reversing rule of *Crawford v. Manning,* 542 P.2d 1091 (Utah 1975), mandating reversal when a party is forced to use peremptory challenge for jury panel member who should have been removed for cause).

¶ 32 In this case, Mr. Wright revealed during voir dire that he had known Detective Nudd fourteen or fifteen years earlier when Mr. Wright was involved in a law enforcement training program. Detective Nudd was Mr. Wright's physical education advisor. When questioned about that experience, Mr. Wright responded that although Detective Nudd had been hard on him during the training, he considered the whole experience a positive one. Mr. Wright also stated his acquaintance with Detective Nudd would not impair his ability to be fair and impartial. The trial court did not further inquire into Mr. Wright's acquaintance with Detective Nudd. Defendant moved to dismiss Mr. Wright for cause, but the trial court denied the motion. Defendant then used one of his peremptory challenges to remove Mr. Wright from the jury panel.

¶ 33 Defendant contends the trial court's questioning of Mr. Wright was "pro forma" and thus "failed to dispel the inference of bias raised by the juror[']s opinion" about Detective Nudd. In addressing this argument, we rely on the Utah Supreme Court's recent statement regarding voir dire questioning. *See State v. Saunders,* 992 P.2d 951 (1999). *Saunders* re-emphasized that "[v]oir dire questioning is essential to choosing an impartial jury, and an impartial jury is as essential to a fair trial as is an impartial judge." *Id.* at 961. Indeed, the supreme court made clear that voir dire procedures should not "qualify jurors as quickly as possible on the basis of superficial questions and a declaration by each juror that he or she can follow the judge's instructions and decide the case fairly." *Id.* Instead, trial courts must "liberally exercise" their discretion in favor of questions designed to discover bias so that counsel may intelligently make for-cause and peremptory challenges. *Id.* (citing *State v. Worthen,* 765 P.2d 839, 845 (Utah 1988)).

¶ 34 With *Saunders*'s guidance in mind, we conclude the trial court's examination of Mr. Wright's relationship with Detective Nudd was not superficial. The trial court not only asked Mr. Wright about the nature of the training program but also inquired about Detective Nudd's role in the program, the extent of their relationship, how Mr. Wright felt about Detective Nudd, and twice asked Mr. Wright whether his experience with Detective Nudd would affect his duties as a juror. We believe this gave counsel adequate information to intelligently exercise a for-cause challenge or a peremptory challenge.

¶ 35 Nevertheless, defendant argues Mr. Wright's answers produced an inference of bias that should have compelled the trial court to grant defendant's for-cause challenge. Defendant cites our decision in *State v. Cox* for support. In *Cox,* the jury panel member told the trial judge her brother-in-law was the chief of police. *See Cox,* 826 P.2d at 658. She also informed the court that the prosecutor trying the case had been her attorney for private business matters, and had, in fact, done so as recently as a month before. *See id.* at 659. Although the trial court asked the juror whether or not she could decide the case impartially, he did not ask her how long the prosecutor had been her attorney or her opinion about the prosecutor. *See id.* at 660.

¶ 36 In concluding that the trial court abused its discretion, we noted that the jury panel member's responses indicated a "long term relationship ... of respect and ·trust." *Id.* Although "[t]he depth of investigation required varies in each situation and 'is necessarily dependent on the juror's responses to the questions asked,'" *id.* (quoting *State v. Woolley,* 810 P.2d 440, 445 (Utah Ct.App. 1991)), the trial court's exploration in *Cox* was only "pro forma," and "did not adequate-

ly refute the inference of bias presented by [her] relationship [with the prosecutor]." *Id.*

¶ 37 The facts in *Cox*, however, differ substantially from those in this case. Mr. Wright's relationship with Detective Nudd did not raise serious concerns of bias or impartiality. The relationship was not substantial, was very brief, and had ceased fourteen or fifteen years earlier. In addition, Mr. Wright's responses indicated a possible bias *against* Detective Nudd, which would favor defendant. Consequently, *Cox* is inapposite to our analysis in this case, and the trial court did not abuse its discretion by not excusing Mr. Wright for cause.

### III. Defendant's Statement

¶ 38 We next address whether the trial court committed prejudicial error by admitting portions of defendant's statement made to police but excluding others. The statement was recorded and subsequently transcribed.

¶ 39 On the night of the incident, Detective Nudd conducted an interview with defendant at the police station, during which defendant made the following statement:

> You know what, you tell the truth, you doin something you don't feel like doing, like this situation when I was driving and you know something is wrong but you can't do nothing about it because you in it already, you know. That's the only feeling that was hitting me when they were beating up the man, you know, when I see the two of them going at it beating up a man not even a man just another person too, another white man[ ] with long hair, it wasn't really hard for me to try to hold them back because they are my friends and when they beat the man down, you know, what my feelings was, you know, should I help them beat up the man or should I just stand here, I didn't want to be a punk and just stand there and not

doing nothing and that was the only thing on my mind. If I wasn't the one that was shooting, I wasn't the one driving, I would probably of beat the man. I know since I tell the truth, that everybody over there that seeing the thing, the witnesses that were over there that would recognize me from they were beating up the man, they know that I wasn't laying a hand on nobody that I was trying to hold my boy back, the big one, the one owned the car. This was enough you know other people around. I know that I was drunk you know. But then again I know what I was doing.

¶ 40 During defendant's trial, the trial court granted the prosecution's motion to introduce a portion of defendant's statement. The trial court simultaneously denied defendant's request to admit the entire statement to put the prosecution's requested portions in context.[4]

¶ 41 In accordance with the trial court's ruling, Detective Nudd gave the following testimony at trial:

Q: Toward the end of the interview, Detective Nudd, what did [defendant] say his feelings were about what was going on?

A: He told me that after the shooting started, [he] felt there just wasn't anything he could do, so he continued in the car with them and then once the accident happened, he said that he was with them, and once they started assaulting [the victim], he said he felt like he didn't want to be a punk and support his friends, but didn't know whether or not to do anything to the guy.

Q: Did he say he didn't want to be a punk and just stand there and not do anything?

A: Yes.

---

4. The trial court made the following ruling:

   I am going to deny the request for admission under [Rule] 106. First of all, based upon its express language I am not satisfied that it applies. Even if it were to apply, I am of the opinion that the competing interest of—well, let me restate that. That the nature of self-

serving statements do not persuade this court that I ought to exercise discretion under Rule 106 and allow any remaining portions of the statement to come in because of fairness. In this court's view at this point, the fairness argues in favor of keeping out the self-serving statements.

¶ 42 Defendant argues this testimony invited the jury to draw an inference that, because defendant did not want to "be a punk and just stand there," he must have participated in the assault. He therefore contends that fairness mandated the introduction of his entire statement to put Detective Nudd's testimony in context. Specifically, defendant invokes the common law "rule of completeness" to support his argument.

¶ 43 The common law rule of completeness entitles a defendant, once portions of a document or recorded statement are introduced, to request the remaining portions of that statement be admitted to put the prior selections in context. This rule is now partially found in Utah Rule of Evidence 106, which states that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Utah R. Evid. 106; *see also Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171–72, 109 S.Ct. 439, 451, 102 L.Ed.2d 445 (1988) (examining history and rationale for Federal Rule 106).[5] A trial court need admit only those portions of a statement " 'relevant and "necessary to qualify, explain, or place into context the portion already introduced." ' " *United States v. Branch*, 91 F.3d 699, 728 (5th Cir. 1996) (citations omitted); *see also United States v. Li*, 55 F.3d 325, 329–30 (7th Cir. 1995) ("A trial judge need not admit every portion of a statement but only those needed to explain portions previously received." (citing *United States v. Haddad*, 10 F.3d 1252, 1258 (7th Cir.1993))).

¶ 44 Generally, "Rule 106 is limited to writings or recorded documents and does not cover out-of-court oral statements." Edward L. Kimball & Ronald N. Boyce, *Utah Evidence Law* 1–32 (1996) (footnote omitted).[6] Thus, the State argues the statement was not admissible under Rule 106 because it was an oral statement. This argument overlooks the fact that the oral statement in this case was tape recorded and then transcribed from that recording. Both the tape recording and the transcript were "writing[s] or recorded statement[s]" within the purview of Rule 106. *See Henderson v. United States*, 632 A.2d 419, 429–31 (D.C.1993) (holding exclusion of defendant's entire audiotaped post-arrest statement is error under Rule 106).[7] Consequently, the trial court erred in denying defendant's motion to admit the entire statement on the basis that Rule 106 was inapplicable.

¶ 45 We must further consider whether the trial court abused its discretion in excluding the statement on the basis of fairness, stating that the statement was merely self-serving. The trial court has considerable discretion in determining issues of fairness, and we find no abuse of that discretion in this case. Furthermore, at trial, the jury heard testimony that supported defendant's version of the incident and put the admitted portion of defendant's statement in context. For instance, before the prosecutor asked Detective Nudd to clarify defendant's statement, Detective Nudd testified that defendant repeatedly asserted that he had attempted to break up the fight. Detective Nudd also testified that defendant told him he "didn't want to be a punk and support his friends." During cross-examination, Detec-

---

5. Because no Utah cases address the present issue under Rule 106, we look to federal cases interpreting Rule 106 as persuasive but not necessarily binding authority. *See Langeland v. Monarch Motors, Inc.*, 952 P.2d 1058, 1062 n. 4 (Utah 1998) ("[F]ederal cases interpreting analogous Federal Rules are compelling to our interpretation of the Utah Rules only insofar as their reasoning is logical and persuasive.").

6. The Advisory Committee Note to Federal Rule 106 explains that

The rule is based on two considerations. The first is the misleading impression created by taking matters out of context. The second is

the inadequacy of repair work when delayed to a point later in the trial.... For practical reasons, the rule is limited to writings and recorded statements and does not apply to conversations.

7. We reject the State's argument that Rule 106 should not apply because the statement was not "introduced by a party," as Rule 106 specifies. Whether the statement was officially introduced as evidence or read from a transcript, as was done in this case, is irrelevant. The effect on the jury was the same.

tive Nudd read from other portions of defendant's statement, in which defendant asserted: "[E]verybody over there that seen the [incident], ... [t]hey know that I wasn't laying a hand on nobody. That I was trying to hold my boy back, the big one. The one [that] owned the car." The jury thus had an adequate opportunity to hear evidence supporting defendant's version of the events and was free to make a finding based on that evidence. *See State v. Vigil*, 840 P.2d 788, 793–94 (Utah Ct.App.1992). The trial court's decision to exclude defendant's statement was not an abuse of discretion simply because the jury chose to disbelieve defendant.

¶ 46 In sum, Rule 106 applied to allow introduction of defendant's entire statement, which was embodied in a written transcript, to put the prosecution's selected portions in context. The trial court, however, did not abuse its discretion in deciding the statement should be excluded on the basis of fairness. We recognize "the danger inherent in the selective admission of post-arrest statements," *Branch*, 91 F.3d at 728 (citation omitted), but defendant had an adequate opportunity during cross-examination to put the selected portions of his statement in context, and other testimony supported his version of the events.

## IV. Sentencing

¶ 47 Finally, we consider defendant's challenge to his enhanced sentence imposed under Utah's gang enhancement statute. *See* Utah Code Ann. § 76–3–203.1 (1999).[8] This statute provides an enhanced sentence for a defendant who committed an underlying offense "in concert with two or more other persons" who would be criminally liable for the offense as accomplices under section 76–2–202. *Id.* § 76–3–203.1(1)(a) & (b). The trial court imposed the enhanced sentence after finding that defendant acted "in con-

cert" with the two Seumanu brothers in committing the assault.

¶ 48 Nevertheless, a successful challenge to the gang enhancement statute earlier this year in the Utah Supreme Court has rendered it, in part, unconstitutional. *See State v. Lopes*, 980 P.2d 191 (Utah 1999), *reh'g denied*, June 23, 1999. In *Lopes*, the supreme court declared that, for a crime to be committed "in concert," as the statute requires, "all three actors must (i) have possessed a mental state sufficient to commit the same underlying offense and (ii) have directly committed the underlying offense or solicited, requested, commanded, encouraged, or intentionally aided one of the other two actors to engage in conduct constituting the underlying offense." *Id.* at 194; *see also State v. Labrum*, 925 P.2d 937 (Utah 1996) (explaining statute's "in concert" language). Consequently, the *Lopes* court concluded that section 76–3–203.1(1) embodies a new crime requiring proof to a jury beyond a reasonable doubt. *See id.* at 194–95 (citing Utah Const. art. I, § 7; U.S. Const. amends. V, XIV). Furthermore, the court stated that the statute's mandate under subsection (5)(c) that "[t]he sentencing judge rather than the jury shall decide whether to impose the enhanced penalty under this section" was an improper delegation to the judge and, therefore, was unconstitutional. *Id.* at 195 (quoting Utah Code Ann. § 76–3–203.1(5)(c)) (citing Utah Code Ann. § 77–17–10 (1995)); *State v. Green*, 78 Utah 580, 589–90, 6 P.2d 177, 181 (1931) ("It is the sole and exclusive province of the jury to determine the facts in all criminal cases, whether the evidence offered by the state is weak or strong, is in conflict or is not controverted.").

¶ 49 The ruling in *Lopes* now compels us to vacate defendant's sentence.[9] The State did not prove beyond a reasonable doubt the criminal intent of the Seumanu brothers and the extent of their involvement

---

8. Section 76–3–203.1 was amended in 1999, effective May 3; however, the Legislature made no substantive changes in that amendment. We thus cite to the most recent version of this statute, even though defendant was initially charged with the offense on May 10, 1997.

9. Our decision to vacate defendant's sentence renders any analysis under the *Shondel* rule unnecessary. *See State v. Shondel*, 22 Utah 2d 343, 453 P.2d 146, 148 (Utah 1969) (holding when two statutes proscribe same criminal conduct, lesser of two punishments should be imposed). We therefore do not address defendant's final argument.

in the assault. Defendant's due process rights were therefore violated. *See id.* at 195. Moreover, the trial court, not the jury, determined that defendant acted in concert with two others in assaulting the victim. That was an impermissible reversal of roles that violated defendant's right to a jury trial.[10] *See id.* at 195–96. Should the State choose to charge defendant with the new crime under section 76–3–203.1, it may do so, but it must prove each element of that crime beyond a reasonable doubt, allowing the fact-finder to determine guilt.

## CONCLUSION

¶ 50 Sufficient evidence supported defendant's conviction for aggravated assault. Reasonable minds could conclude, under the facts of this case, that a broken jaw which healed normally constitutes serious bodily injury, as defined in Utah's criminal code. The trial court, therefore, did not abuse its discretion in submitting the charge to the jury.

¶ 51 The trial court also adequately investigated any potential biases during voir dire and did not abuse its discretion in denying defendant's for-cause challenge to a potential juror. Likewise, the trial court did not abuse its discretion in excluding voir dire Questions 26, 41, and 49, which were improperly phrased and did not directly address possible bias or prejudice.

¶ 52 Defendant's entire transcribed statement made to police could have been admitted under Utah Rule of Evidence 106 to put in context portions introduced by the prosecution. Nevertheless, the trial court did not abuse its discretion in excluding certain portions of defendant's statement on the basis of fairness.

¶ 53 Based on these conclusions, we affirm defendant's aggravated assault conviction. We vacate his sentence, however, because the trial court improperly imposed an enhanced sentence under an unconstitutional statutory provision. We therefore vacate defendant's enhanced sentence and remand for resentencing on the aggravated assault conviction.

¶ 54 WE CONCUR: MICHAEL J. WILKINS, Presiding Judge, and JAMES Z. DAVIS, Judge.

---

10. The State contends any error in sentencing defendant under the gang enhancement statute was harmless. We disagree. The trial court did not instruct the jury that it must first find criminal culpability for the three actors before defendant could receive an enhanced penalty. " 'Failure to give an elements instruction for a crime satisfies the manifest injustice standard under [Utah Rule of Criminal Procedure] 19(c) and constitutes reversible error as a matter of law.' " *State v. Stringham,* 957 P.2d 602, 608 (Utah Ct.App.1998) (quoting *State v. Gibson,* 908 P.2d 352, 354 (Utah Ct.App.1995)) (alteration in original).