**2025 UT App 25**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
WAYNE ADAM WALL,
Appellant.

Opinion
No. 20221019-CA
Filed February 27, 2025

Eighth District Court, Vernal Department
The Honorable Edwin T. Peterson
No. 181800755

Freyja Johnson and Hannah Leavitt-Howell,
Attorneys for Appellant

Derek E. Brown and William M. Hains,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and AMY J. OLIVER
concurred.

LUTHY, Judge:

¶1 Wayne Adam Wall appeals his conviction on two counts of aggravated sexual abuse of a child. He asserts four claims on appeal. First, he argues that the district court improperly prevented him from asking a particular question of potential jurors during voir dire. Second, he asserts that the court abused its discretion by overruling his objection to certain statements by the prosecutor during closing arguments. Third, he contends that his trial counsel (Counsel) was ineffective by not objecting to additional statements by the prosecutor during closing

arguments.[1] Finally, he maintains that Counsel was ineffective by not objecting to certain hearsay admitted at trial. Wall's arguments are unavailing, and we affirm his convictions.

## BACKGROUND[2]

### *The Fishing Trip*

¶2      For a number of years, Wall and the father (Father) of a blended family were "good friends" and "like brothers" to each other. Father and his wife have three children, two girls and one boy. Father is the stepparent of the son and one daughter (Daughter), and he is the biological parent of the other daughter. For some years, until the "spring of 2017ish," Wall lived with Father's family and, during that time, often babysat the children, becoming known as "Uncle Wayne." Even after Wall moved out, he would still visit "once every other week or so" and would still occasionally babysit the children.

¶3      In June 2018, when Daughter was six years old, Father took the three children to a reservoir to go fishing. Father and the children were to be joined by Wall. As Father and the children pulled up to the reservoir, Daughter told Father that "Uncle Wayne would take her in his room and pull her panties down and put his bad spot under her bum." Father "instantly" became "angry and frustrated" and asked Daughter "if she was telling the

---

1. Wall and the State were each represented by two attorneys below. For simplicity, we refer to the defense attorneys and the prosecutors in the singular.

2. "In an appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Kufrin*, 2024 UT App 86, n.1, 551 P.3d 416 (cleaned up).

truth." He told her that this kind of accusation was "not something [they] need[ed] to joke [about] or make up." Father then instructed the children to wait in the car, and he "went to [Wall's] truck and confronted him about the situation." When Father confronted Wall with the allegation, Wall "instantly leaned back" and "got very defeated." "His eyes started going back and forth really fast," and "[h]e was stammering his words."

¶4 Eventually, the children—including Daughter—got out of the car and began "playing by the lake." As they played, Father continued to watch Wall, who had also exited his vehicle, and noted that he was pacing and smoking more than usual. Father contemplated how he could "kill [Wall] without [the] kids seeing and dispos[e] of his body." Father later testified, however, that he also "wanted [Daughter's accusation] to not be true" because his "best friend [was] being accused of molesting [his] daughter."

¶5 While the children were playing at the reservoir, Daughter was hit in the head by a rock. Father bandaged her wound and took the children home. He then contacted the police, who put him in touch with an officer (Officer). Officer set up an interview for Daughter for later that day with a detective (Detective) at the local Children's Justice Center (CJC).

*The CJC Interviews, Medical Examination, and Charges*

¶6 During Detective's initial interview with Daughter, she did not disclose any abuse by Wall; instead, she talked about having been hit in the head with a rock. Detective ended the interview and asked CJC personnel to arrange for Daughter to be examined by a pediatric sexual assault nurse practitioner (Nurse).

¶7 Two days later, Nurse met with Daughter. Nurse explained that she performs "checkups on kids to make sure their bodies are healthy" and that she would "see a child if someone has been mean to them or been hurting their bodies." Nurse asked Daughter "if she knew where her private parts were" and what

she calls them. Daughter pointed "between her legs up at her crotch" and said that she calls that area her "bad spot." Nurse next asked Daughter if anybody had touched her bad spot, and Daughter replied, "Uncle Wayne when he lived with us." Nurse then conducted a physical exam of Daughter, which indicated normal results for a child her age.

¶8 A few weeks later Detective interviewed Daughter again. This time she recounted her allegation against Wall, including that he had touched her inappropriately, though she gave inconsistent numbers—including 8 and 100—when asked how many times this had occurred. Wall was then charged with two counts of aggravated sexual abuse of a child. Wall denied the allegations, and the case proceeded to trial.

*Voir Dire*

¶9 Prior to trial, both the prosecutor and Counsel submitted lists of proposed questions to be asked of potential jurors. At a pretrial hearing, the court noted that the parties had "submitted lengthy voir dire" and said, "If you really want any of the questions asked, please highlight them for me because I've got several pages of stuff. And . . . with the booklets we sent out to the people, most of the questions are taken care of or I take care of them in my preamble questions."

¶10 Counsel subsequently informed the court that there were five questions she specifically wanted to ask, one of which was, "Do you believe children are capable of lying about significant events?" As to that question, the court responded, "I'm not going to give [it]. You make your own case when we get to it, but I'm not going to ask whether they think any particular type of witness is lying or not. I'll allow you to make your arguments on that, but I'm not going to ask that in voir dire."

¶11 The court was also hesitant to allow the next question in Counsel's list: "Are you or a member of your family or a friend a

sexual assault counselor, social worker, psychotherapist, psychologist, or psychiatrist?" The court explained that because there were "only about four" such people in the local community, Wall would "probably have to convince [the court] why [he] need[ed]" the question. Wall responded by suggesting that the question be modified and combined with a previously approved question: "Have you, or any member of your family[,] or [a] relative, or a friend been the victim of sexual assault or rape, or been accused as the perpetrator of sexual assault or rape[,] . . . or served as a juror on a sexual assault or rape case?" Counsel suggested that the court simply add "or work[ed] in this field" to that already approved inquiry. The court assented to that suggestion.

*The Trial*

¶12    Father was the State's first witness at trial. After recounting Daughter's disclosure on the way to the reservoir, Father testified that the other children had partially confirmed Daughter's account. Specifically, on questioning by the prosecutor, Father testified:

> Q. And did you confirm with the other kids anything?
>
> A. Yes.
>
> Q. What did you confirm?
>
> A. I confirmed that he had been taking her in his room by herself.
>
> Q. And by "her," you mean [Daughter]?
>
> A. Yes.

Father then testified about meeting Wall at the reservoir and the other events of that day. On cross examination, Counsel asked

specifically whether Father confirmed with the other children that Wall would take Daughter alone into his room. Father confirmed that he had. Counsel then asked, "And you didn't tell [Officer] that?" to which Father replied that he could not remember.

¶13 The State also called Detective, Nurse, and Daughter (who was ten years old at the time of trial). Together, the State's witnesses testified to the facts recited above. The defense then called Officer, a CJC interviewer, Father, and a former police officer who had experience with sex crimes and who had conducted "several hundred" forensic interviews of children. When Officer took the stand for the defense, Counsel asked Officer whether Father had reported "that he verified with the other children what [Daughter's] accusation was," and Officer answered, "No."

*The Closing Arguments, Conviction, and Appeal*

¶14 During closing arguments, Counsel began by focusing on the State's burden of proof. She then turned to Daughter's statements, saying, "Let's take a moment to examine [Daughter's] story, or, rather, her five stories." Counsel then walked the jury through inconsistencies that had appeared in Daughter's story over time, and she highlighted questions about Daughter's story that had not been answered by the evidence presented. Counsel also reviewed Father's testimony, similarly calling into question his credibility. In one instance, Counsel observed that "for the very first time" at trial, Father had said that he confirmed Daughter's accusation with his other children but that Father had not reported this to Officer or Detective. Counsel then argued, "[Father] performed for you and told you that."

¶15 Counsel then addressed the State's investigation, saying, among other things,

> After story number one, they didn't charge Wayne Wall; after story number two, they didn't charge

Wayne Wall; after story number three, they did not . . . charge Wayne Wall. [Detective] had to make it happen, and so he went back and got story number four.

And when that story didn't . . . make sense, he took action to create the story.

Counsel identified additional questions that had been left unanswered by the evidence, and she noted potential witnesses who had not been called to testify, including Daughter's siblings, saying, "This is an example of the State showing you only what they want you to see" and "the State is withholding those witnesses from you because they don't have anything of value."

¶16    Counsel also critiqued the prosecutor, asserting,

From the questioning, it became very clear that the prosecutor[] had met with [Daughter] prior to her testimony and reviewed what was there and what wasn't there, and they needed to come up with an explanation.

As I said to you, every single time a story was told by [Daughter], an adult came in and cleaned it up. [The prosecutor] did [that] for [Daughter] on the witness stand.

Finally, Counsel concluded by arguing, "It's the job of the government, with all of their resources, with all of their professionals, all of their—the people on their CJC team, to seek justice for everyone; but somewhere and somehow that has changed into seeking convictions."

¶17    In her rebuttal closing argument, the prosecutor responded by saying,

[Counsel] spoke about a lot of things that simply aren't in evidence. She put words in people's mouths . . . she wants to make you think or try to get you to believe that people thought something or should have thought something or said something, including me, which just simply are incorrect.

Some of those things are just not in evidence. She wants to make a big deal about that, that they're not in evidence and, therefore, there's no case; but I would just ask you to not worry about all of that side stuff.

The prosecutor continued, "I don't have anything to attack or anything to defend. I just simply want to tell the story . . . ."

¶18    The prosecutor then recounted some of the testimony of each of the State's witnesses. In the midst of this recitation, the prosecutor observed,

It seems like [Counsel] want[s] to make a big deal that steps were done improper, that I'm only here to get a conviction. [Counsel] wants you to believe that there was corruption in all of these different steps, when we're each just doing our jobs and following up on some allegations that [Daughter] made about [Wall].

¶19    Later, the prosecutor said, "[Daughter has] had the same consistent story all along . . . . She has no reason to lie; she has no reason to elaborate. This family has no reason to lie. I have no reason to misconstrue details." Counsel objected to this last statement as "bolstering the witness." The court overruled the objection, explaining that "it's closing argument and, you know, everybody gets to say what they think about what the witness has testified."

¶20 Following the closing arguments, the jury found Wall guilty on both counts of aggravated sexual abuse of a child, and Wall now appeals.

ISSUES AND STANDARDS OF REVIEW

¶21 Wall raises four issues on appeal. He first asserts that the district court improperly limited voir dire when it did not allow his question regarding the believability of children. "We review a judge's decision imposing limits on voir dire questioning for an abuse of discretion."[3] *State v. Reece*, 2015 UT 45, ¶ 16, 349 P.3d 712.

¶22 Second, Wall claims that the district court erred when it overruled Counsel's objection to certain statements in the prosecutor's closing argument. "[W]hen a prosecutorial misconduct objection is made below, we review the district court's ruling on the objection for abuse of discretion." *State v. Lyden*, 2020 UT App 66, ¶ 12, 464 P.3d 1155.

¶23 Wall's third and fourth claims are that Counsel was ineffective by (1) not objecting to additional statements the prosecutor made during her closing argument and (2) not objecting to Father's hearsay statements regarding what the other children told him. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of

---

3. The State contends that part "of Wall's voir dire claim is unpreserved." We address Wall's voir dire claim without resolving the preservation issue. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved *in favor of the party asserting that the claim was not preserved*, we readily may opt to do so without addressing preservation.").

law." *State v. Guerro*, 2021 UT App 136, ¶ 25, 502 P.3d 338 (cleaned up).

ANALYSIS

I. Limits to Voir Dire

¶24    Wall asserts that the district court exceeded its discretion by rejecting his requested voir dire question, "Do you believe children are capable of lying about significant events?" We conclude that the court did not abuse its discretion.

¶25    "The purpose of voir dire examination is both the detection of actual bias and the collection of data to permit informed exercise of the peremptory challenge." *State v. Reece*, 2015 UT 45, ¶ 45, 349 P.3d 712 (cleaned up). District courts are not required to "permit *every* question that might disclose some basis for counsel to favor or disfavor seating a particular juror." *Id.* (cleaned up). However, district courts "should be permissive in allowing voir dire questions and should exercise their discretion in favor of allowing counsel to elicit information from prospective jurors." *Id.* (cleaned up). Despite this permissiveness, defendants do not have a right to have questions asked "in a particular manner." *Id.* (cleaned up).

¶26    Additionally, the range of discretion a court has in deciding whether to permit a particular voir dire question varies depending on the topic at issue. "If the proposed question directly relates to bias and prejudice, the scope of the [district] court's discretion is strictly limited" and "must be exercised in favor of allowing discovery of biases or prejudice in prospective jurors." *State v. Leleae*, 1999 UT App 368, ¶ 23, 993 P.2d 232 (cleaned up). On the other hand, the court's discretion "increases . . . as the direct relationship of the question to bias and prejudice decreases." *Id.* And when questions "are more clearly directed at discovering jurors who would be favorable" to the defendant's

"theory of the case," the district court "has the greatest degree of freedom to exclude them." *State v. Piansiaksone*, 954 P.2d 861, 868 (Utah 1998). Indeed, "questions or statements about specific defenses, scenarios, or evidence—even presented as hypotheticals—should be excluded from juror examination." *State v. Williams*, 2018 UT App 96, ¶ 31, 427 P.3d 434. "Simply stated, these types of 'stakeout' questions are improper."[4] *Id.*

¶27 The question at issue here—"Do you believe children are capable of lying about significant events?"—was quite clearly aimed at discovering jurors who would be favorable to the defense's theory that Daughter was lying about the abuse. Our opinion in *State v. Leleae*, 1999 UT App 368, 993 P.2d 232, is instructive on this point. There, the district court rejected a proposed voir dire question that read, "Do any of you believe that an eyewitness can never make a mistake?" *Id.* ¶ 29. We viewed that question as not addressing "a possible prejudice or bias" but, rather, as "a thinly veiled attempt to ferret out which jurors were more likely to believe [the] defendant's theory of the case," *id.* ¶ 30, namely, that an eyewitness who identified the defendant as having been among the people who assaulted the victim was mistaken, *see id.* ¶¶ 6–12. Similarly here, the proposal to ask potential jurors whether they "believe children are capable of lying about significant events" was at least as much about Wall's theory of the case—that Daughter was lying—as it was a neutral inquiry into potential juror bias regarding child witnesses. And it

---

4. In *State v. Williams*, 2018 UT App 96, 427 P.3d 434, we acknowledged that there are exceptions to the general prohibition of stakeout questions when "matters of intense controversy" are involved. *Id.* ¶ 31 n.11 (cleaned up). But we said that those exceptions did not apply in *Williams*, which involved sexual abuse of children. *See id.* ¶¶ 1, 31 n.11. Because we implicitly decided in *Williams* that child sex abuse cases are not matters of intense controversy for purposes of voir dire, the exceptions we acknowledged in *Williams* do not apply here.

appears that the district court viewed the question this way when, in rejecting the question, it said, "You make your own case when we get to it . . . . I'll allow you to make your arguments on that, but I'm not going to ask that in voir dire." We therefore see no abuse of discretion in the court's refusal to allow that question.

¶28 At the same time, we acknowledge that Wall's question was also arguably aimed, at least in part, at discovering bias regarding child witnesses, which, when relevant, may be a proper subject of voir dire. Accordingly, Wall contends that the court's denial of the opportunity to ask the question he proposed was a refusal by the court to permit any inquiry into potential juror bias regarding child witnesses. For three interrelated reasons, we disagree.

¶29 First, a question could have been constructed to discover bias regarding child witnesses without simultaneously telegraphing Wall's specific theory of the case. For example, the court asked the potential jurors the following appropriately worded question about bias regarding law enforcement officers: "Would you give more or less weight to the testimony of a law enforcement officer just because the witness is a law enforcement officer, or would you treat a law enforcement officer the same as any other witness?" And a similarly worded question could have been asked about child witnesses.

¶30 Second, it was not the court's responsibility to craft a proper question about potential bias regarding child witnesses, especially where, after the question he proposed was rejected, Wall never alerted the court that the purpose of his question was to discover such bias and not to ferret out which jurors were amenable to his theory of the case. *See State v. Dixon*, 717 S.W.2d 847, 848 (Mo. 1986) (en banc) (agreeing that the defendant was entitled to voir dire inquiry on a particular subject, but noting that after an objection to his initial voir dire was sustained, "[c]ounsel did not attempt to frame [an appropriate] question," and

concluding that "[t]he court had no obligation to frame a question for him").

¶31    Finally, there is no indication that the court would not have been amenable to a rephrased question aimed at discovering bias related to child witnesses if Wall had proposed one. Indeed, immediately after the court rejected Wall's question about the truthfulness of child witnesses, it expressed hesitancy to ask Wall's next proposed question as well. Wall responded by suggesting that the question be modified and combined with a previously approved question. The court approved that suggestion, evidencing a willingness to work with Wall to craft voir dire questions that addressed appropriate topics while eschewing inappropriate ones.

¶32    For the foregoing reasons, the court did not exceed its discretion in refusing to allow Wall's voir dire question, "Do you believe children are capable of lying about significant events?" And by refusing to allow that question, the court did not prevent all inquiry into potential juror bias regarding child witnesses. In sum, Wall's arguments in this regard provide no basis for reversal.

## II. The Objection to the Prosecutor's Closing Argument

¶33    Wall next asserts that the district court abused its discretion when it overruled his objection to the following statements of the prosecutor during closing arguments: "[Daughter has] had the same consistent story all along . . . . She has no reason to lie; she has no reason to elaborate. This family has no reason to lie. I have no reason to misconstrue details." We ascertain no such abuse of discretion.

¶34    At trial, Counsel objected to the prosecutor's statements as "bolstering the witness." "We acknowledge the impropriety of a prosecutor bolstering a witness by vouching for [the witness's] credibility." *State v. Ashcraft*, 2015 UT 5, ¶ 35, 349 P.3d 664 (cleaned

up). Such "impermissible vouching . . . occurs when the prosecution places the prestige of the government behind the witness by making explicit personal assurances of the witness'[s] credibility, or implicitly indicates that information not presented to the jury supports the testimony." *Id.* (cleaned up).

¶35 Wall argues that by telling the jury she "ha[d] no reason to misconstrue the details," the prosecutor impermissibly "crosse[d] the line into 'personal assurances'" (quoting *id.*) and "gave 'the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant,' and invited 'the jury to trust the Government's judgment rather than its own view of the evidence'" (quoting *State v. Thompson*, 2014 UT App 14, ¶¶ 51, 57, 318 P.3d 1221). We disagree.

¶36 The prosecutor did not indicate explicitly that she had access to evidence that had not been presented to the jury. And when viewed in context, her comment did not implicitly convey that she was relying on extra-record evidence to vouch for any witness's credibility either.

¶37 Counsel had ended her closing argument by questioning the prosecutor's motive, saying that rather than "seek[ing] justice," the prosecutor was "seeking convictions" and that the prosecutor was doing so by "com[ing] up with an explanation" for evidence Counsel claimed was missing and by helping Daughter to "clean . . . up" her story "on the witness stand." Against that backdrop, the prosecutor used her rebuttal closing argument to summarize key evidence, explain why the State did not have and present other evidence, and give common sense, evidence-based reasons why Father and Daughter should be believed. In that context, the prosecutor's statement that she "ha[d] no reason to misconstrue the details" was clearly a comment on *her own* candor in summarizing the evidence, not as a personal assurance of any witness's credibility. Because the prosecutor gave no "personal assurances of [*a*] *witness'*[*s*]

credibility," *Ashcraft*, 2015 UT 5, ¶ 35 (emphasis added) (cleaned up), the prohibition against witness bolstering simply is not implicated here.

¶38　Wall further argues, however, that the prosecutor's assertion that she had no reason to misconstrue the details "inaccurately conveyed that the prosecutor was neutral and objective in asking the jury to convict" and that this inaccuracy was impermissibly "misleading." In other words, Wall asserts, "the prosecutor effectively urged the jury to take her word for it, as a neutral party without a reason to spin the evidence one way or another," and thereby "improperly bolstered *the State's case*." (Emphasis added.) We are not convinced.

¶39　In *State v. Redcap*, 2014 UT App 10, 318 P.3d 1202, *abrogated on other grounds as recognized by State v. Hosman*, 2021 UT App 103, 496 P.3d 1162, a case arising out of a prison fight, the defense attorney asserted in closing that one of the testifying officers in the case had acted as he did because he "had 'a job to do and that's to try to get a conviction.'" *Id.* ¶¶ 1, 36. In response, the prosecutor asserted that the officers in the case "'ha[d] no bias,' because 'their job is to protect everybody out there' and '[t]hey're on duty to protect all the inmates.'" *Id.* ¶ 36. On appeal, the defendant claimed that his trial counsel had been ineffective for not objecting to the prosecutor's response. *See id.* ¶¶ 31–36. We observed, however, that "the doctrine of fair reply allows a prosecutor to make a counteracting statement after defense counsel opens the door on the issue." *Id.* ¶ 38 (cleaned up). We then concluded that "the prosecutor's comments about the credibility of the testifying officers were a fair reply to defense counsel's argument that the officers were not credible and that they were tasked to secure a conviction." *Id.* ¶ 39.

¶40　Just as defense counsel in *Redcap* argued that the officer was pursuing an agenda of simply "try[ing] to get a conviction," *id.* ¶ 36, Counsel argued here that "somewhere and somehow" the

prosecutor had "changed" from "seek[ing] justice" to simply "seeking convictions." Even though the prosecutor's response in this case was in support of her own professional integrity rather than that of a witness, the fair reply doctrine still applies. Her assurance that she had no reason to misconstrue the details of the case was a fair reply to Counsel's argument that she was merely seeking a conviction.

¶41 For the foregoing reasons, the district court did not abuse its discretion by overruling Wall's objection to the prosecutor's closing argument.

### III. Ineffective Assistance of Counsel

¶42 Finally, Wall contends that Counsel provided ineffective assistance by (1) failing to object to other statements made by the prosecutor in her closing argument and (2) failing to object to Father's hearsay testimony. To establish that Counsel provided ineffective assistance of counsel, Wall must establish "that counsel's performance was deficient" and that this "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because Wall must establish both prongs of this test, if he fails to make either showing, his claims fails. *See id.* As explained below, we conclude that Wall failed to establish that counsel performed deficiently under either of his theories, and we therefore affirm Wall's convictions.

A.    The Prosecutor's Statements

¶43 Wall first argues that Counsel provided ineffective assistance by failing "to object to additional prosecutorial misconduct maligning defense counsel." The specific statements that Wall contends reasonable counsel would have objected to fall into three groups.

¶44 First, Wall points to several instances where the prosecutor claimed Counsel had made inaccurate assertions. Specifically, the

prosecutor said that Counsel had "put words in people's mouths" and tried "to get [the jury] to believe that people thought something or should have thought something or said something, including [the prosecutor], which just simply [were] incorrect." Counsel did not perform deficiently by failing to object to these statements because she *had* made inaccurate assertions. For example, although the prosecutor never questioned Daughter about whether she heard any sounds when Wall abused her, Counsel argued, "She was asked that question by [the prosecutor]: 'Did you hear any sounds? Did he say anything?' Nope." Similarly, even though Detective testified that he interviewed Father's other daughter, Counsel argued that "[n]o one interviewed" her. Thus, in the face of the claim that she had put words in people's mouths and tried to get the jury to believe things that were not correct, Counsel might reasonably have forgone an objection to avoid the prosecutor responding by pointing out specific instances where Counsel had done just that.

¶45  Second, Wall contends that Counsel performed deficiently by not objecting when, after noting to the jury that Counsel had made both inaccurate assertions and "a big deal" about things that were not in evidence, the prosecutor asked the jury to "not worry about all of that side stuff." But reasonable counsel could conclude that there was nothing improper about a prosecutor characterizing misstatements of the evidence, and matters that were not in evidence, as "side stuff" and therefore forgo an objection.

¶46  Lastly, Wall asserts that Counsel performed deficiently by not objecting when the prosecutor (1) asserted that Counsel wanted the jury to "believe that there was corruption" in the way the State actors investigated the case; (2) pushed back on the notion that the prosecutor was "only [there] to get a conviction"; and (3) represented that the prosecutor "[didn't] have anything to attack or anything to defend" and the State actors were "each just

doing [their] jobs and following up on some allegations that [Daughter] made about [Wall]."

¶47    Yet Counsel had just argued that even after Daughter had told three "stories" about the abuse, the State knew it could not charge Wall and, therefore, tasked Detective with "[going] back and [getting] story number four." "And when that story didn't . . . make sense," Counsel had contended, "[Detective] took action to create the story." She had said that the prosecution was showing the jury "only what [it] want[ed] [the jury] to see" and "withholding [certain] witnesses from" the jury. She had asserted that "the prosecutor[] had met with [Daughter] prior to her testimony and reviewed what was there and what wasn't there," knew the prosecution "needed to come up with an explanation," and therefore had "an adult [come] in and clean[] . . . up" "every single time a story was told by [Daughter]." And Counsel had concluded by contending that, although "[i]t's the job of the government . . . to seek justice[,] . . . somewhere and somehow that [had] changed into seeking convictions."

¶48    Given the picture the foregoing assertions could paint, Counsel might have reasonably believed, along the lines of our analysis above, *see supra* ¶¶ 38–40, that any objection to the prosecutor's statements in response would have been overruled on the basis that they were fair reply. Counsel might also have reasonably chosen not to risk undercutting her own credibility by appearing, through an objection based on "improper maligning of the defense," to be seeking an unfair advantage by depriving the prosecutor of the chance to respond to Counsel's own harsh criticism.

¶49    For the foregoing reasons, Wall has not shown that Counsel performed deficiently by failing to lodge additional objections to the prosecutor's closing argument, and this ineffective assistance claim therefore fails.

B.     Father's Hearsay Testimony

¶50     Wall also contends that Counsel provided ineffective assistance "by failing to object to [Father's] hearsay testimony." At trial, Father was asked whether, after learning from Daughter about Wall's abuse, he "confirm[ed] with the other kids anything." Father responded, "Yes. . . . I confirmed that [Wall] had been taking [Daughter] in his room by herself." Failure to object to this statement was not deficient performance.

¶51     The failure to object "to an error does not automatically render counsel's performance deficient." *State v. Ray*, 2020 UT 12, ¶ 31, 469 P.3d 871. Rather, to succeed on his claim, Wall must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (cleaned up). And sound trial strategy may include using improper testimony to the defendant's advantage. *See Ray*, 2020 UT 12, ¶ 34 ("If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance."). Such is the case here.

¶52     Counsel used Father's hearsay testimony for impeachment by asking Father if he had reported to the police the other children's statements. Father responded, "I don't remember." Counsel then had Officer, to whom Father initially reported the abuse, testify. Counsel asked Officer whether Father had reported "that he verified with the other children what [Daughter's] accusation was," and Officer responded, "No." Then in closing, Counsel argued that because Father had not initially reported the other children's statements, his testimony on that point at trial was merely a "perform[ance] for" the jury. Additionally, Counsel appears to have anticipated that if she had succeeded on a hearsay objection, the prosecution would have called the other children to testify. Therefore, instead of objecting, she used their absence to her advantage, arguing in closing that because "[t]hose children

didn't come in and testify," they were among the witnesses "the State [was] withholding . . . from [the jury] because they don't have anything of value." In short, Counsel made a calculated and reasonable decision to use Father's hearsay testimony to Wall's advantage. Thus, the decision not to object to that testimony was not deficient performance, and this ineffective assistance claim also fails.

## CONCLUSION

¶53 The district court did not abuse its discretion when it rejected Wall's proposed voir dire question about the truthfulness of child witnesses. Neither did the court abuse its discretion when it overruled Wall's objection to statements made by the prosecutor during closing arguments at trial. And Counsel did not provide ineffective assistance by failing to object to additional statements by the prosecutor or by failing to object to hearsay statements by Father. Accordingly, we affirm Wall's convictions.

_____