2025 UT App 172

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ELIJAH MCDONALD,
Appellant.

Amended Opinion[*]
No. 20230669-CA
Filed November 20, 2025

Third District Court, Salt Lake Department
The Honorable Paul B. Parker
No. 201902938

Peter Daines, Attorney for Appellant

Derek E. Brown and Michael Gadd,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and AMY J. OLIVER
concurred.

LUTHY, Judge:

¶1 Elijah McDonald was convicted of aggravated assault for breaking a man's jaw with a single punch to his face. McDonald asks us to reverse his conviction, asserting that his trial counsel

---

[*] This Amended Opinion replaces the Opinion in Case No. 20230669-CA issued on August 21, 2025. After that opinion issued, the appellee filed a petition for rehearing, and we called for a response. We grant the petition in part and issue this revised opinion to reflect our determination on rehearing that our holding regarding the meaning of "likely" should be limited to the aggravated assault statute.

(Counsel)[1] rendered ineffective assistance by confusing the jury during closing arguments and by failing to take adequate steps to correct that confusion when the jury submitted a question to the court during its deliberations. We are persuaded that Counsel rendered ineffective assistance, and we therefore vacate McDonald's conviction.

## BACKGROUND[2]

### *The Altercation*

¶2     McDonald was seventeen years old, weighed between 125 and 130 pounds, and stood five feet, three inches tall. He also had a sixteen-year-old brother, Isaac.[3] Isaac was "a runaway" who was "couch hopping [between] friends' houses" and dating Olivia. McDonald and his mother had not seen Isaac for nearly two years.

¶3     Olivia lived with her mother; her mother's boyfriend, Stan; her older sister; her older sister's three children; and her younger brother. Stan apparently weighed at least 200 pounds and was about five feet, seven inches tall.

¶4     One evening, Olivia and her family were preparing to leave their house to go to a restaurant. Isaac was with them. As the family gathered in front of their house, McDonald, his mother,

---

1. McDonald was represented by two attorneys at trial. We refer to them collectively as "Counsel" for convenience.

2. "In an appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Wall*, 2025 UT App 25, n.2, 566 P.3d 726 (cleaned up).

3. Other than McDonald, the names used in this opinion are pseudonyms.

and two other women pulled up in McDonald's car and parked on the street in front of the house.

¶5 McDonald's mother got out, approached the porch where Olivia's mother and Isaac were standing, and thanked Olivia's mother for "giving [Isaac] food and just kind of helping out with his living situation." McDonald, on the other hand, immediately confronted Isaac, "kind of pushing him" and yelling, among other things, "How can you do this to our family?" Stan "decided this [wasn't] a good thing" and "went and got between [Isaac] and [McDonald] to deescalate the situation," saying, "Look, this is not going to happen," and stepping off the porch with McDonald.

¶6 At that point, McDonald's mother "kind of lunged forward [onto the porch] and slapped [Isaac]." Olivia's mother "hollered at" McDonald's mother to "not hit [Isaac] again." McDonald's mother responded by "sock[ing]" Olivia's mother "in the nose." This "diverted [Stan's] attention," and he turned to look toward the porch. As Stan turned back toward McDonald with his "mouth . . . kind of open," McDonald "punched [him] in the jaw." Stan "had no idea [the punch] was coming." He immediately felt a "pop" and "[s]harp pain" and "knew something was very wrong." He "felt [his] jaw kind of hanging there, kind of loose." Eventually, blood began "oozing from his mouth."

¶7 Still wanting to deescalate the situation, Stan "got [McDonald] in a headlock and proceeded to walk him towards . . . his car." After they reached "the corner of the property," McDonald appeared to calm down, so Stan "let him go." But McDonald came at him again. Stan put McDonald in "another headlock" until he "calmed down" and "wasn't struggling or fighting anymore." By this time, at least some of the women had made their way—"fighting"—"across the street in[to] the neighbor's yard." Stan therefore "went across the street to try to break up the girls." As Stan was trying "to get the girls off of each other," McDonald "[came] at [him] one more time," prompting Stan to "get [McDonald] again" and pin him against one of the family's vehicles.

¶8 "At that point the girls [were] still going kind of crazy across the street," and Stan realized that his efforts to "control the situation" were not working. So he let McDonald go, went into the house, and retrieved a pistol. When he came back outside, Stan "fired one warning shot into the ground" and told McDonald, McDonald's mother, and the women who had come with them to leave, which they did.

*The Evidence at Trial*

¶9 McDonald was charged as an adult with aggravated assault for punching Stan and breaking his jaw, and the case proceeded to a jury trial. At trial, Stan, Olivia's mother, and Olivia's sister all testified for the State, recounting the altercation as described above. Stan also described the injury to his jaw and its impact on his life. He explained that the punch broke his jaw, which required surgery to insert screws and wire his jaw shut while it healed. His jaw remained wired shut for three months. At the time of trial, more than three years later, Stan still had nerve pain in his jaw.

¶10 McDonald did not testify at trial, but the State played a video of testimony he had given during a pretrial hearing. In the video, McDonald asserted that after arriving at the house, he was "trying to talk to [Isaac]" when Stan "[got] in [his] face" and said, "[D]on't talk to my son. Get off my property. You can't talk to my son." McDonald stated that he responded by "walk[ing] away," back to the street, and standing next to his car. Meanwhile, McDonald explained, Stan appeared drunk and was "[a]ggravated," "super red," and "[m]ad for no reason." McDonald stated that Stan followed McDonald back to his car, pressed "his stomach against" McDonald, and repeatedly said, "[W]hat are you going to do, boy?" McDonald testified that, because of Stan's behavior, he "just got scared" and "swung." After playing the video of McDonald's prior testimony, the State rested.

¶11    The defense called Olivia's sister and Stan to testify about a video Olivia's sister had taken of part of the altercation. Then the defense rested.

*The Jury Instructions*

¶12    Prior to closing arguments, the court instructed the jury—both orally and in writing—on the elements of aggravated assault, as follows:

INSTRUCTION NO. 27

Aggravated Assault

[McDonald] is charged in Count I with committing Aggravated Assault on or about January 11, 2020. You cannot convict him of this offense unless, based on the evidence, you find beyond a reasonable doubt each of the following elements:

1.  On or about January 11, 2020

2.  In Salt Lake County

3.  [McDonald]

4.  Intentionally, knowingly, or recklessly:

5.  Committed an act with unlawful force or violence that

    a.  Caused bodily injury to [Stan]; or

    b.  Created a substantial risk of bodily injury to [Stan]; and

6.  Intentionally, knowingly, or recklessly:

    a.  Used other means of force likely to produce death or serious bodily injury; and

7.  [McDonald's] actions resulted in serious bodily injury to [Stan].

The court further instructed the jury that "'[s]erious bodily injury' means bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death." And it instructed the jury that "'[p]rotracted' is defined as continuing for a long time, or longer than is normal or necessary."

*The Closing Arguments*

¶13   The prosecutor began her closing argument by recounting the altercation as it had been described by the live witnesses during the State's case in chief. She then addressed each element of aggravated assault in turn. When she reached the element requiring a finding that McDonald used force likely to produce death or serious bodily injury, she stated simply, "[W]e know that [he did] because he punched [Stan] so hard in the face that he caused that bodily injury. The force he used with that punch broke [Stan's] jaw in two places."

¶14   In Counsel's closing argument, he began by asserting— based on McDonald's recorded testimony and the video Olivia's sister had taken—that the punch did not occur when Stan was distracted by McDonald's mother hitting Olivia's mother on the porch but, rather, when Stan got in McDonald's face near McDonald's car. Counsel then also addressed the elements of aggravated assault. Regarding the element requiring the use of force likely to produce death or serious bodily injury, Counsel argued:

> Causing something doesn't make what you did likely. Those are two totally separate elements. . . . So this argument that we know the force [was] likely to cause death or serious bodily injury because he caused serious bodily injury, that makes it just one element. . . . [But] [t]hose are two separate elements . . . .

Counsel then continued:

> What does likely mean? There's an instruction
> which means you have to give it its regular and
> ordinary meaning[4] . . . . I would argue that the
> regular and ordinary meaning of likely, gives you—
> the, the best case for the State would be that that
> means something is like 50.1 percent going to
> happen based on this action. I would argue it's way,
> way higher than that . . . .

Counsel then asserted that when flipping a coin, "the fact that you flipped it and you got heads[] doesn't make flipping a coin likely . . . to result in getting heads." Similarly, Counsel contended, the fact that a person may have won the lottery once with a particular set of numbers does not mean that the same numbers are "likely to win the lottery" again.

¶15    Regarding this element, Counsel concluded:

> I've talked about statistics[,] but . . . if you went to
> buy life insurance[,] the actuaries would skyrocket
> if you were likely to kill somebody or cause serious
> injury by one punch. . . . You might not be able to
> buy life insurance if you are likely to die from one
> punch. . . . This is what we're talking about. We're
> talking about a kid. . . . A kid who's smaller hits an
> adult once. And the State is telling you that
> somehow they have proven because of the result
> that one punch is likely to cause death or serious
> bodily injury. It's just not even possible. . . . [T]here's
> a reason we have jurors . . . . We want people that
> live in the real world and bring their own
> experiences to say . . . no, that's ludicrous. One body,

---

4. The record contains a proposed jury instruction stating, "Unless these instructions give a definition, you should give all words their usual and ordinary meaning." But that instruction was omitted from the set ultimately given to the jury.

one person[,] especially a smaller[,] younger person punching another person[,] is not likely to cause death or serious bodily injury. . . . It's an impossible burden they've created for themselves when they charged him. Because it's not possible. One punch is just not likely to cause that[,] and there's nothing they can do to prove it . . . .

¶16 In her rebuttal, the prosecutor responded, "If you sucker punch someone in the face as hard as you can, is it possible that their jaw will break? If you hit someone in the jaw. I would argue, yes. I would argue it's likely."

*The Jury's Note to the Court and the Court's Response*

¶17 Partway through its deliberations, the jury sent a note to the court. It read: "Can we get clarification on instruction No. 27 6a? How much weight do we put on the word likely?" Neither Counsel nor the prosecutor proposed that the court include in its response to the jury any clarification regarding the meaning of "likely." The court eventually responded to the jury's question as follows:

> The State must prove beyond a reasonable doubt each element of the crime charged including whether the force used would likely cause death or serious bodily injury. Instruction 27 tells you that [McDonald] must have acted either intentionally, knowingly, or recklessly as to whether the force he used would likely cause death or serious bodily injury. The evidence you consider relevant to the issue and the weight given to the evidence is for you to decide.

¶18 About twenty minutes after receiving the court's response to its question, the jury concluded its deliberations and found McDonald guilty of aggravated assault. McDonald now appeals.

ISSUES AND STANDARD OF REVIEW

¶19   McDonald raises two claims of ineffective assistance of counsel. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Wall*, 2025 UT App 25, ¶ 23, 566 P.3d 726 (cleaned up).

ANALYSIS

¶20   McDonald contends that Counsel provided ineffective assistance by (1) "confusingly explain[ing] the meaning of 'likely' in a way that undermined the defense, reduced the State's burden, and made an otherwise clear jury instruction ambiguous" and (2) "failing to clarify [the jury instructions] when given the chance." To succeed on a claim of ineffective assistance of counsel, McDonald must establish that Counsel's "performance was deficient" and that this "deficient performance prejudiced" McDonald's defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We are persuaded that with regard to his first ineffective assistance claim, McDonald has satisfied both of these elements. We address each element of McDonald's first ineffective assistance claim in turn.[5]

I. Deficient Performance

¶21   To constitute deficient performance, defense counsel's actions must have been objectively unreasonable. *Id.* at 687–88, 690. To establish deficient performance, a defendant must overcome "a strong presumption that [defense] counsel's conduct [fell] within the wide range of reasonable professional assistance" and "might be considered sound trial strategy." *Id.* at 689 (cleaned

---

5. Because we resolve McDonald's first ineffective assistance claim in his favor and vacate his conviction on that basis, we need not address his second ineffective assistance claim.

up). Thus, we are "required not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (cleaned up). Additionally, we must "evaluate the conduct from counsel's perspective at the time," rather than with the benefit of hindsight. *Strickland*, 466 U.S. at 689. Moreover, even if we "cannot conceive of a sound strategic reason for counsel's challenged conduct, it does not automatically follow that counsel was deficient." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350. Ultimately, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).

¶22     To convict McDonald, the jury was required to find that when he punched Stan, he used a means of force "likely to produce death or serious bodily injury." *See* Utah Code § 76-5-103(2)(b)(iii).[6] During closing arguments, Counsel told the jury it should give "likely" its "regular and ordinary meaning." He then said that "the best case for the State would be that that means something is . . . 50.1 percent going to happen" but that he "would argue it's way, way higher than that." McDonald contends that Counsel's argument "instructed the jury that the meaning of 'likely' accommodates a probability as low as 50.1% in contravention of the word's bona fide dictionary definition and common meaning," and that this amounted to deficient performance. In the context of this case, we agree.

¶23     When a statutory term, like the word "likely" here, is not defined in the code, courts give the term its ordinary meaning. *See State v. Bilek*, 2018 UT App 208, ¶ 24, 437 P.3d 544 ("We . . . give effect to each [statutory] term according to its ordinary and

---

6. Utah Code section 76-5-103 was amended after McDonald's conviction. *Compare* Utah Code § 76-5-103 (2020), *with id.* § 76-5-103 (2024). Because the amendments did not substantively change the elements of the crime as charged against McDonald, we cite the current version for convenience.

accepted meaning." (cleaned up)). Juries are also, therefore, to give such a term its ordinary meaning. *See State v. Juarez*, 2021 UT App 53, ¶ 22 n.7, 489 P.3d 231 ("Jurors are bound to follow the law as stated by the court." (cleaned up)). Merriam-Webster defines "likely" in this context to mean "having a high probability of occurring or being true: very probable." *Likely*, Merriam-Webster, https://www.merriam-webster.com/dictionary/likely [https://perma.cc/LJ6C-62DP]. Cambridge Dictionary instructs that "[i]f something is likely, it will probably happen or is expected." *Likely*, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/likely [https://perma.cc/T4VC-DJB9]. Black's Law Dictionary defines "likely" in this context as "[s]howing a strong tendency; reasonably expected." *Likely*, Black's Law Dictionary (12th ed. 2024). And in another context our supreme court has said that "likely" means "probable." *See Colosimo v. Gateway Cmty. Church*, 2018 UT 26, ¶ 29, 424 P.3d 866 (holding in the context of trespassing that "knowledge that children are *likely* to trespass means that the possessor knows that it is *probable* that children will trespass . . . in the foreseeable future" (emphasis added)). In turn, "probable" is defined to mean "likely to be or become true or real" or, more helpful here, "supported by evidence strong enough to establish presumption but not proof." *Probable*, Merriam-Webster, https://www.merriam-webster.com/dictionary/probable [https://perma.cc/EQU7-C4WV]; *see also Probable*, Black's Law Dictionary (12th ed. 2024) (defining "probable" as "[l]likely to exist, be true, or happen.").

¶24 While these definitions do not assign an identifiable percentage of probability to the meaning of "likely" and even suggest that "likely" encompasses a range of probabilities, they all convey that "likely" means a probability of occurrence that is markedly more than 50.1%. And importantly, the State concedes as much in its brief by characterizing a probability of 50.1% as an "unsupportable" and "indefensible" definition of likely. Given the definitions cited above and the parties' agreement on this point, we conclude that to say "likely"—as the term is used in this

statute—has a range of meaning that includes a probability as low as 50.1% is a misstatement of the law.[7]

¶25 Although Counsel did not embrace a 50.1% probability as the meaning he thought the jury should apply, his argument nevertheless conveyed that the ordinary meaning of "likely" in this context encompasses a range of probabilities that, in the best case for the State, includes a 50.1% probability and that it was up to the jury to decide—based on the parties' arguments—which meaning within the identified range to employ. This argument misstated the law, and it did so in a way that permitted a lowering of the State's burden.

¶26 The State contends that Counsel's argument was based on a reasonable strategy of "imput[ing] the unsupportable 50.1% standard to the State" and, having thereby "established the State's straw-man position, . . . deftly attacking it, persuasively arguing it was unreasonably low." The State's argument would be persuasive if Counsel had clearly conveyed that any endorsement of the 50.1% standard would be contrary to law and, thus, impermissible for the jury to employ. But Counsel did not do that. Rather than imputing the argument to the State and then making clear that the imputed argument was legally indefensible, he endorsed the idea that the legal meaning of "likely" encompasses a "best case" for the State of a 50.1% probability but that Counsel "would argue" for a different meaning. While there could be a sound strategic reason for imputing a straw-person argument to the State and then clarifying that the argument is legally indefensible under the court's instructions, we discern no sound strategic purpose in materially misstating the law (even inadvertently, as we believe happened here) to the detriment of

---

7. Because we recognize that the degree of probability represented by "likely" may vary depending on the context in which it is used, we limit our holding here to the meaning of "likely" as it is used in the aggravated assault statute. We leave open the possibility that "likely" may represent a different degree of probability in a different statutory context.

the defendant and then relying on attorney argument to persuade the jury not to apply the misstated law. We further conclude that not only did Counsel's misstatement of the law lack a sound strategic purpose, but it was also objectively unreasonable. Thus, Counsel's argument constituted deficient performance.

## II. Prejudice

¶27    We now turn to the prejudice prong of the test for ineffective assistance of counsel. To satisfy this prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* That standard is met here.

¶28    The evidence that McDonald used unlawful force or violence and that Stan sustained a serious bodily injury as a result was substantial. Hence, the case essentially came down to whether McDonald's punch amounted to a means of force likely to cause serious bodily injury. And on that front, we have previously observed that "[n]ot all punches are created equal." *State v. Martinez*, 2015 UT App 193, ¶ 32, 357 P.3d 27. This is because "the force behind each blow differs." *Id.* Thus, a jury considering an aggravated assault charge must infer from something in addition to the fact that a punch was thrown "how much force a defendant actually used and whether that force was likely to cause serious bodily injury under the particular facts of the case." *Id.* And while "the extent and type of injuries the victim suffered are among the types of evidence probative of that question," the fact "[t]hat a victim has suffered a serious bodily injury does not by itself establish that the defendant used force *likely* to cause that injury." *Id.*

¶29    Here, the evidence on this issue included testimony from three witnesses that McDonald punched an unguarded, slack-jawed Stan near the porch and broke his jaw. It also included,

however, the undisputed evidence that McDonald was a relatively short, lightweight seventeen-year-old, while Stan was a robust adult several inches taller. Additionally, McDonald's recorded testimony was that Stan was not a distracted victim but, instead, that he was the initial aggressor, appeared drunk, and was getting in McDonald's face near McDonald's car when McDonald punched him.

¶30 Serious bodily injury—i.e., injury that results in "serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or . . . a substantial risk of death," Utah Code § 76-1-101.5(17)[8]—is less than a *certain* result of a punch to a robust adult's jaw by a lightweight seventeen-year-old. At the same time, a jury could readily determine the probability of such an injury to be more than 50% if the punch is unanticipated and thrown against a slack jaw. But the question the jury should have been answering was whether in this case serious bodily injury was, at a minimum, "probable" or "reasonably expected" to occur. *See Colosimo v. Gateway Cmty. Church*, 2018 UT 26, ¶ 29, 424 P.3d 866; *Likely*, Black's Law Dictionary (12th ed. 2024). And the question *we* must answer is whether there is a reasonable probability that the verdict would have been different if Counsel had not created the possibility of the jury deciding the case based on an understanding of "likely" meaning a probability as low as 50.1%.

¶31 Our resolution of that question rests largely on the jury's note and the backdrop against which it was written. Counsel asked the jury rhetorically, "What does likely mean?" He then answered that one possible meaning was a 50.1% probability of something occurring. He also "argued" that likely should be interpreted to mean something "way, way higher than that," but he provided no concrete counterbalancing definition. And the

---

8. The statute defining "serious bodily injury" has been renumbered since the time of McDonald's charged conduct, but the definition remains the same. *Compare* Utah Code § 76-1-601(15) (2020), *with id.* § 76-1-101.5(17) (2025).

prosecutor added no clarity when she appeared to assert, as follows, that something is likely if it is "possible": "If you sucker punch someone in the face as hard as you can, is it possible that their jaw will break? . . . . I would argue, yes. I would argue it's likely." Given the foregoing guidance the jury received, we find it difficult to read its question about what "weight" to "put on the word likely" as anything other than an inquiry about the degree of probability the word is meant to reflect.

¶32    In light of Stan's and McDonald's relative sizes, the conflicting evidence regarding the circumstances of the punch, and the importance the jury plainly placed on the "weight" it was to "put on the word likely," we conclude there is a reasonable probability that if Counsel had not indicated to the jury that it could interpret likely to mean a 50.1% probability, the verdict would have been more favorable to McDonald. Thus, McDonald was prejudiced by Counsel's deficient performance.


CONCLUSION

¶33    Counsel performed deficiently by misstating the law in a way that allowed the jury to believe it could convict McDonald based on a finding of a 50.1% chance that the force he used would cause serious bodily injury. McDonald was prejudiced by this deficient performance, particularly in light of the jury's question making plain that it was struggling with the "weight" to "put on the word likely." We therefore vacate McDonald's conviction and remand this matter for additional proceedings consistent with this opinion.

——————